INDUCTOTHERM INDUSTRIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Inductotherm Industries, Inc. v. Commissioner
Docket No. 2857-81.
United States Tax Court
T.C. Memo 1984-281; 1984 Tax Ct. Memo LEXIS 389; 48 T.C.M. (CCH) 167; T.C.M. (RIA) 84281; May 29, 1984. *389 P Corp. acquired the stock of S Corp., a corporation with substantial unused net operating loss carryovers and other built in tax losses, and immediately placed S Corp. in voluntary bankruptcy. After the referee in S Corp's. bankruptcy confirmed its plan of reorganization, P Corp. reactivated the business of S Corp. and, by advancing funds to S Corp., kept it alive for a period of about two years. P Corp's. successor then liquidated S Corp. into itself and attempted to utilize S Corp's. unused net operating loss carryovers. Held, P Corp's. advances to S Corp. constituted equity rather than debt for Federal tax purposes; held further, S Corp. was solvent on the date it was liquidated and the liquidation therefore qualified as a valid sec. 332/ 334(b)(1), I.R.C., 1954, liquidation; held further, P Corp's. successor is not precluded by sec. 381(a), I.R.C., 1954, from claiming the net operating loss carryovers of S Corp.; held further, P Corp's. acquisition of S Corp's. stock was primarily motivated by tax avoidance or evasion considerations within the intendment of sec. 269, I.R.C., 1954. Accordingly, P Corp's. successor is not entitled to claim losses which accrued economically *390 to S Corp. prior to the acquisition by P Corp. of S Corp's. stock. David B. Avigdor and Stephen E. Lampf, for the petitioner. Robert B. Marino and Alfred A. Pierri, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioner's Federal income taxes as follows: Fiscal Year Ending
Deficiency
April 30, 1974
$7,338.03
April 30, 1975
524,863.99
After concessions, the issues remaining for decision are as follows: (1) Whether petitioner is entitled to deduct net operating loss carryovers totaling $1,059,903.40 for its fiscal year ending April 30, 1975; or, in the alternative, (2) whether petitioner is entitled to a deduction of $225,226.32 under either section 165(g)(3) [1] (worthless stock) or section 166(a)(1) (business bad debt). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached *391 thereto, are incorporated herein by this reference. For purposes of clarity, the findings will be set out under separate subheadings. I. General Findings
Inductotherm Industries, Inc. (hereinafter referred to as "petitioner"), is a corporation organized under the laws of the State of New Jersey, and its principal place of business was at Rancocas, New Jersey, when the petition was filed in this case. Petitioner filed Federal income tax returns on the basis of a fiscal year ending April 30. Petitioner had its genesis in a single corporation known as Inductotherm Corp., (hereinafter referred to as "Inductotherm") which was founded in 1953 by Henry M. Rowan (hereinafter "Rowan"). The original business of Inductotherm was the design and manufacture of induction and melting furnaces for use in the metals industry. Following its formation in 1953, Inductotherm began to expand its business operations by, inter alia, acquiring controlling interests in other companies involved in the metallurgy business and other closely related fields. Inductotherm's policy of expansion through acquisition ultimately rendered its original ownership structure obsolete, and Inductotherm therefore found *392 it necessary to reorganize. Pursuant to this reorganization, petitioner was formed in 1973 as an industrial holding company with controlling interests in Inductotherm and subsidiaries theretofore owned by Inductotherm. Rowan was installed as president and chairman of the board of petitioner. Throughout the 1960's Inductotherm acquired interests in numerous corporations whose businesses were closely related to the metallurgy field and, by 1969, held interests in approximately 22 such subsidiaries. During the early 1970's, in an attempt to diversify, it began to acquire interests in corporations whose businesses were not, strictly speaking, closely related to the metallurgy field, and by 1972 had expanded its holdings to approximately 26 subsidiaries. In early 1972, Rowan was introduced to Allen E. Bardwell (hereinafter "Bardwell") who was the president, treasurer and chairman of the board of a company known as Trident Industries, Inc. Subsequent events ultimately led to Inductotherm's acquisition of Trident Industries, Inc. However, before the facts relating to this acquisition are addressed, it is first necessary to consider the historical evolution of Trident Industries, Inc. *393 II. Trident Industries - Background
During the years prior to 1962, Bardwell had developed a certain amount of expertise in the well-drilling field. This expertise did not derive from any formal engineering training, but was acquired by Bardwell over a number of years during which he had worked with his father and uncles drilling oil wells. At some time during 1962, Bardwell conceived a plan to develop a new type of tool which he believed would improve the efficiency of the traditional cable technique which was used in the drilling of wells. [2] The tool contemplated by Bardwell was one which could be attached to a cable drilling rig and would function to redirect energy downward from the drilling tools after they made initial impact with the ground. During late 1962 or early 1963, Bardwell received financial backing and, with others, formed a corporation called Trident Industries, Inc. (hereinafter "Old Trident") *394 for purposes of developing his concept. After about one year of research and development, Bardwell, through Old Trident, placed his invention (called a chatter hammer) and related products on the market. The chatter hammer developed by Bardwell increased the penetration rate of traditional cable drilling by between 100 and 300 percent. Old Trident did not actually manufacture the chatter hammer and related products; rather, Old Trident engaged independent subcontractors for these purposes. When Bardwell acquired patents on his investions such patents were assigned to Old Trident. From the year of its creation until 1968, Old Trident did not ever generate a profit, but consistently produced losses. Old Trident's financial failure was at least partially a function of the fact that technology in the well-drilling field during the early and mid-1960's had rendered the cable drilling technique somewhat obsolete. Specifically, during this period of time, a new method of drilling, called rotary drilling, had been developed. Rotary drilling operates under different principles than cable drilling and is a significantly faster drilling technique. [3] Moreover, the rotary drilling technique *395 was, at that time, being developed and marketed by large companies such as Ingersol Rand, and Old Trident was in direct competition with such companies. Despite the fact that the rotary drilling system was considerably faster than the cable system, Bardwell at all times remained optimistic that there was a place in the market for the cable system as modified by his chatter hammer. This was because the rotary system was larger and more expensive to install than the cable system. For this reason, Bardwell thought the cable-chatter hammer method would prove more economical for drilling relatively shallow wells and could be successfully marketed for such purposes. However, by 1968, Old Trident had almost exhausted its supply of *396 operating capital and Bardwell therefore recognized that more operating funds would be required in order to make a success of his invention. During October or November of 1968, in an attempt to secure a future source of operating capital, Bardwell, on behalf of Old Trident, entered into negotiations with a company known as Waltham Industries, Inc. (hereinafter "Waltham"). These negotiations came to fruition in 1969 when, pursuant to agreement, Waltham acquired all of the assets of Old Trident in consideration for which Waltham assumed all of the liabilities of Old Trident and transferred 100,000 shares of Waltham common stock to Old Trident. [4] Shortly thereafter, Waltham formed Trident Industries, Inc. (hereinafter "New Trident") as a wholly owned subsidiary corporation to operate the business theretofore carried on by Old Trident, and transferred to New Trident certain assets that it had acquired from Old Trident. [5] Additionally, New Trident assumed the liabilities of Old Trident which Waltham had originally assumed. Bardwell was installed as president, chairman of the board and treasurer of New Trident. Selden A. Stone (hereinafter "Stone") was named vice-president and general *397 manager of New Trident. Throughout the remainder of 1969 and during 1970, New Trident, under the direction of Bardwell and Stone, attempted to perfect the chatter hammer drilling technique, developed other related products and began to establish a customer base for these products. However, since New Trident's product line was not, at that time, fully developed, New Trident was not financially self-sufficient and found it necessary to call upon Waltham for financial support. During this period, Waltham advanced to New Trident $530,243 in the form of loans, and on its consolidated income tax return for its fiscal year ending December 26, 1970, Waltham reported a total net operating loss of $310,408 from New Trident's operation. In early 1971, Waltham made further advances to New Trident, *398 so that by February 1971, New Trident's outstanding indebtedness to Waltham totaled $570,243.30. However, by late 1970, Waltham had begun to experience serious financial setbacks and by February 1971, Waltham had filed for bankruptcy in a United States District Court in California. Thus, by February 1971, Waltham ceased making any advances of funds to New Trident. After Waltham entered into bankruptcy proceedings and ceased to constitute a source of funds for New Trident, Bardwell and Stone continued to work on a non salary basis for New Trident during 1971 in an attempt to keep that company afloat. However, during the latter part of 1971, it became apparent to Bardwell that the income generated from New Trident's business had not yet reached a level sufficient to offset operating expenses and Bardwell therefore began to solicit potential purchasers who might be able to provide that company with sufficient funds so that it could continue to operate. Bardwell was unsuccessful in locating a purchaser for New Trident during 1971. On its 1971 Federal income tax return, New Trident reported a net operating loss of $321,243.96 from its operations during 1971. III. The Purchase of *399 New Trident by Inductothem
By the time Bardwell approached Rowan in January 1972, New Trident's parent company (Waltham) was thus in bankruptcy proceedings, and New Trident itself was experiencing financial difficulty. Moreover, Rowan was not familiar with New Trident's line of business. Nevertheless, Rowan invited Bardwell to make a presentation at Inductotherm's board of directors meeting to be held on January 25, 1972, concerning Bardwell's proposals. In his presentation to Inductotherm's board of directors, Bardwell informed the board of New Trident's financial circumstances but also remained optimistic concerning its future. Specifically, Bardwell felt that New Trident's business had finally reached the point that it could be expected to generate a substantial profit within a short period of time. Thus, the minutes of the January 25, 1972, meeting state in relevant part: [New Trident is a company which] was left in an inactive status due to the Waltham dissolution. The principals making the presentation feel they can buy the patents [from Waltham] for about $30,000; and they feel they can generate some $500,000 of sales within 2 years, with a 50% margin on sales. Following *400 Bardwell's presentation to Inductotherm's board of directors on January 25, 1972, that entity was fully aware of New Trident's unhealthy financial circumstances. In a memorandum dated January 27, 1972, Robert F. Hotchkin (hereinafter "Hotchkin"), who was treasurer of Inductotherm during all years in issue, [6] wrote: [New] Trident appears, at this time, to be a bankrupt wholly-owned subsidiary of Waltham. Waltham itself is in some serious degree of financial difficulty. Bardwell's prposed relationship with Inductotherm did not comtemplate an acquisition of New Trident's stock. Rather, as originally conceived by Bardwell, the business of New Trident was to be reestablished in a new corporation under Inductotherm's control. Thus, Hotchkin described Bardwell's proposed relationship between New Trident and Inductotherm as follows: Now, Messrs. Bardwell and Stone believe they can reestablish the Trident business under a new name after they acquire the *401 use of the name, trademarks, all patents, domestic and foreign, all copyrights, sales literature and company files. Upon the reacquisition of the patents and other mentioned assets at the lowest cost available, Bardwell proposes to assign these to the newly created company, called Trident Tool Corp., on a royalty concept calling for 2% of net sales, provided sales are profitable, and up to a maximum of 30% of pre-tax profit. This would be reviewed on an annual basis, and it also presumes that the patents have a definitive value. For their past services and for the knowledge that they will and Mr. Bardwell would like to retain 20%, leaving 75% available to Inductotherm for its sponsorship. Tentative salaries have been set at $25,000 for Mr. Bardwell and $20,000 for Mr. Stone, with a 10% pre-tax bonus available to Mr. Stone. (There is no pre-set base which first has to be earned stated in this respect. We should follow through on this.) The company proposes, for the first few years, to maintain office at Princeton, New Jersey and will make arrangements for the manufacture of its product with various sub-contractors, providing for direct shipments to its customers. Therefore, *402 the Princeton office will be largely a sales office dealing only with sales representatives and the customers of the company. For financial needs, it is conceivable that Trident will call upon Inductotherm to support it in the acquisition of the patents and for assistance in acquiring dies to the extent of about $15,000. The company's needs for forgings can be handled through its supply source; and we may, through use of Celmar, work out some arrangement to the mutual assistance of both. Apparently, at this time, Inductotherm considered the above-proposed relationship to be satisfactory. On February 2, 1972, in a New Jersey state receivership proceeding, New Trident assigned all of its assets to Joseph Markowitz (hereinafter "Markowtiz") and Gary S. Lewis (hereinafter "Lewis") for the benefit of New Trident's creditors. On the same day, Inductotherm reserved the corporate name to Trident Tool Corp. with the State of New Jersey. Shortly thereafter, Bardwell tendered an offer of $2,500 to coassignees Markowitz and Lewis for the purchase of the following patents: Patent No.
3522852
Perm-A-Gauge Expandable Bit
Patent No.
3590931
Hydrolift Waltham Assigned
Patent No.
3409091
Chatter Hammer, two-spring
Patent No.
3545554
Perm-A-Gauge Staggered Inserts
Patent No.
3303899
Obsolete Chatter Hammer
Patent No.
3388753
Pile Driver
Patent No.
3215212
Percussion Hammer Drill
Patent No.
3409095
Chatter Hammer - Commercial
On *403 February 9, 1972, Markowitz and Lewis, as coassignees, filed in the Mercer County Probate Court for the State of New Jersey, a notice of assignment and sale which stated that they had received the above-referenced offer from Bardwell and indicated that any higher offer must be in their hands by February 22, 1972. This notice also stated that the coassignees would sell all of New Trident's assets at public auction on February 25, 1972. At Inductotherm's board of directors meeting of February 21, 1972, the board authorized Hotchkin to accompany Bardwell to the auction sale of New Trident's assets. Additionally, the board authorized Hotchkin to bid up to a maximum of $50,000 for the patents used in New Trident's business. Moreover, in anticipation of the purchase of these assets, Hotchkin, on behalf of Inductotherm, on February 24, 1972, filed a certificate of incorporation with the New Jersey Secretary of State, forming Trident Tool Corp., (hereinafter "Old Trident Tool"), to be effective March 1, 1972. This certificate authorized Old Trident Tool to issue 1,000 shares at par value of $1.00 each and listed the initial board of directors of Old Trident Tool as Rowan, Bardwell, Stone *404 and Hotchkin. On February 29, 1972, the certificate of incorporation for Old Trident Tool was issued. [7]
However, the above-referenced auction sale never occurred. Certain creditors of New Trident had previously petitioned the United States District Court in New Jersey for a stay of the State assignment for the benefit of creditors proceeding and to place New Trident in bankruptcy proceedings. On February 25, 1972, the day of the proposed auction, the District Court entered an order staying the State proceedings until such time as the request to place New Trident into bankruptcy proceedings should be approved or dismissed. Pursuant to such order, the auction was cancelled. [8] *405 Nevertheless, in anticipation of the ultimate purchase of New Trident's assets, Inductotherm, on February 28, 1972, entered into an agreement with Bardwell and Stone which, in pertinent part, provided as follows: Mr. A. Eugene Bardwell and Mr. Selden A. Stone, having acquired experience in the water well drilling equipment business, wish to form a corporation to become associated with Inductotherm Corp. and to become actively engaged in the manufacture and sale of water well drilling equipment and related parts and accessories. Both Mr. Bardwell and Mr. Stone agree to devote all of their time and interests to the development of this business. To this end, a new corporation has been formed styled Trident Tool Corp., with a proposed office at Rancocas, New Jersey. Mr. Bardwell is interested, with the financial help of Inductotherm Corp., in reacquiring patents to which he once had ownership and which he had conveyed to Trident Industries, Inc. which company now is non-existent. Inductotherm Corp. will support Mr. Bardwell in the acquisition of the patents from the Receiver of the assets of Trident Industries, Inc. and will protect Mr. Bardwell with respect to royalty *406 payments based on an amount stated hereinafter and also with respect to reversionary rights under certain circumstances. Mr. Bardwell agrees to assign these newly acquired assets to Trident Tool Corp. For their past services and for the knowledge that they will convey to the company, Mr. Stone will receive and retain a 5% equity in the shares outstanding and Mr. Bardwell will receive and retain a 20% interest, leaving 75% available to Inductotherm Corp. for its share. It is recognized that in the attempt to reacquire the patents, Inductotherm Corp. may call upon financial assistance from Messrs. Stone and Bardwell, at the option of Inductotherm Corp.; and if so, it is proposed that Inductotherm's equity now mentioned at 75% would be diluted by the ratio that the combined Stone-Bardwell contribution to patent acquisition bears to the total intended capital investment of Inductotherm Corp. stated, at this time, to be $156,000.00, plus the amount Messrs. Stone and Bardwell spend upon the patents. In other words, that ratio obtained by dividing the amount expended by Stone and Bardwell in patent acquisition by the total investment by both Inductotherm and Stone-Bardwell interests. *407 Inductotherm reserves the right to completely finance the patents without turning to this alternative option. * * * For financial needs, in addition to the invested capital by Inductotherm Corp., Trident Tool Corp. will call upon Inductotherm to support it in working capital requirements. These funds will be advanced on interest-bearing notes stated at Inductotherm's prime. It is envisioned that the first year's advances will not be in excess of $150,000.00, without considering patent acquisition. Although Bardwell and Inductotherm were unable to acquire the assets of New Trident at this time, Old Trident Tool nevertheless began conducting the business previously carried on by New Trident. Although it is not absolutely clear on this record, apparently Old Trident Tool was afforded the use of the technical assets of New Trident by way of a licensing agreement (see text accompanying footnote 13, infra). Since difficulties had developed regarding the patent acquisition, Inductotherm engaged an attorney, Edward Gross (hereinafter "Gross") to assist with such acquisition. On March 15, 1972, as a result of the efforts of Gross, the United States District Court in New Jersey dismissed *408 the bankruptcy proceedings pending against New Trident. This action had the effect of placing New Trident's assets back into the hands of coassignees Markowitz and Lewis in the state assignment for the benefit of creditors proceedings. On March 17, 1972, Gross, on behalf of Inductotherm, tendered an offer of $10,000 to coassignees Markowitz and Lewis for the purchase of all of New Trident's patents, pending patents, trademarks, trademark applications, inventions, engineering drawings, backup technical information, including customer lists, and marketing and sales data. For reasons which are not entirely clear on this record, [9] this proposed purchase was never consumated. At some time during late March or early April 1972, Inductotherm, at the suggestion of Gross, [10] *409 shifted its focus and began negotiating with a Mr. Danning, trustee for Waltham in bankruptcy, for the purchase of New Trident's stock. In late March 1972, Gross, on behalf of Inductotherm, tendered to Danning an offer to purchase all New Trident stock owned by Waltham, as well as Waltham's right, title and interest in the patents theretofore used in New Trident's business, for a total consideration of $10,000. At the time of this offer, New Trident's stock was pledged to Waltham's secured creditors. Danning considered Inductotherm's purchase offer, with modifications, to be acceptable and, on May 23, 1972, he filed with the United States District Court for the Central District of California (the Court having bankruptcy jurisdiction over Waltham at the time), an application for authority to consent to a plan of arrangement, compromise claims and transfer stock of subsidiaries, which provided in pertinent part as follows: 2. The Trustee has been advised that on offer has been received from INDUCTOTHERM CORPORATION whereby this estate would transfer all of its right, title and interest in and to all patents and trade mark applications and patent applications used in connection with TRIDENT's business, whether standing in the name of TRIDENT or WALTHAM or ALLEN E. BARDWELL, *410 for $10,000 to be paid to the Trustee; in addition, WALTHAM would assign to the buyer, or its nominee (or release) all claims of any kind that it may have against TRIDENT INDUSTRIES, INC. TRIDENT owes to WALTHAM the sum of approximately $570,243.30. In addition, TRIDENT owes to MIF INDUSTRIES, INC. and to STEVENS CORPORATION a combined figure of approximately $74,206.90. Nothing herein shall be deemed to waive or release any sums owing by TRIDENT to MIF INDUSTRIES, INC. or to STEVENS CORPORATION; except that nothing herein shall be deemed to prevent the chief executive officers of those corporations, upon such terms as they deem satisfactory, from releasing all claims owing to them by TRIDENT, if Applicant does not object thereto. As futher consideration to this estate, ALLEN E. BARDWELL and SELDON A. STONE would release their claims against this Debtor estate in the approximate combined amounts of $45,333 and hold this estate harmless therefrom. Mr. BARDWELL also claims certain royalties from WALTHAM in the amount of approximately $55,000, which claim would also be released. The buyer, or Messrs. BARDWELL and STONE, will as additional consideration, procure a release of WALTHAM *411 by PRINCETON BANK with respect to WALTHAM's liability to PRINCETON BANK (BANK), based upon a guaranty of TRIDENT'S obligations to the BANK. This guaranty is in the amount of $50,000, but could be diminished to some extent by collections of accounts receivable by BANK. Danning further represented to the Court that: 3. So far as can be determined, WALTHAM transferred all of its right, title and interest in and to the patents described in Paragraph 2 above, to TRIDENT, along with all other assets of [Old Trident] as consideration for the transfer by TRIDENT to WALTHAM of all of TRIDENT'S issued and outstanding stock.Although this might not have been recorded with the Patent Office, nevertheless, the Trustee believes that the formulation of a Plan of Reorganization at the present time would best be served by the transfer of patent rights in accordance with the pending offer. During June 1972, the parties, upon the United States District Court's approval of the above-referenced plan of reorganization, entered in the following transactions: On June 23, 1972, Danning as trustee of Waltham, conveyed to Inductotherm all of New Trident's stock, as well as Waltham's interest in other assets *412 described in the following "Bill of Sale:" CURTIS B. DANNING, Trustee under Chapter X of WALTHAM INDUSTRIES CORPORATION, Debtor, United States District Court, Central District of California, No. 94420-CC, for a valuable consideration, receipt of which is hereby acknowledged, does hereby grant, bargain, sell and convey to INDUCTOTHERM CORPORATION all of his and WALTHAM INDUSTRIES CORPORATION'S right, title and interest in and to all of the assets and shares of corporate stock of TRIDENT INDUSTRIES, INC., including, but not limited to, all of the Trustee's and WALTHAM INDUSTRIES CORPORATION'S right, title and interest in and to the TRADEMARK APPLICATIONS, PATENT APPLICATIONS AND PATENTS set forth in Exhibit A hereto. * * * TRADE MARK APPLICATIONS 1. Trident (with a trident symbol enclosed in a circle as a dot over the letter "i"). 2. Tri-Gel 3. Perm-A-Gauge Bit 4. Hydrolift A. E. BARDWELL PATENT APPLICATIONS Title
Date of Filing
Serial Number
Expandable Drill Bit
and
Reamer Construction
8/18/67
661,560
Drill Bit with
Staggered Teeth
12/3/68
780,753
Lifting Device for
Percussion Drill
Cuttings
1/7/69
789,542
Locking Nut
… the foregoing BILL OF SALE also includes all interest in and to the following: *413 Inventor
(i)
Patent #3,215,212, d. 11/2/65
Allen E. Bardwell
(percussion hammer drill)
(ii)
Patent #3303899, d. 2/14/67
Allen E. Bardwell
(synchronous chatter percussion
hammer drill)
(iii)
Patent #3388753, d. 6/18/68
Allen E. Bardwell
(driving tool)
(iv)
Patent #3409091, d. 11/5/68
Allen E. Bardwell
(percussion multi-blow
gravity drill)
(v)
Patent #3409095, d. 11/5/68
Allen E. Bardwell
(percussion chatter hammer drill
(vi)
Patent #3522852, d. 8/4/70
Allen E. Bardwell
(expandable drill bit and reamer
construction)
(vii)
Patent #3545554, d. 12/8/70
Allen E. Bardwell
(drill bit with stagger teeth)
(viii)
Patent #3637030, d. 2/15/72 approx.
Allen E. Bardwell
(trigel)
(ix)
Patent #3590931, d. 7/6/71
Allen E. Bardwell
(lifting device for percussion
drilling cuttings)
(x)
All patents pending in the United States
(xi)
All foreign patents, patent
applications and patents
pending
(xii)
All inventions, engineering drawings,
specifications
and research and development
(xiii)
All trademarks and trademark applications
(xiv)
All backup and technical information,
including but not
by way of Limitation, customer lists
and marketing or
sales material and data. On the same day, Danning, on behalf of Waltham, assigned to Inductotherm the $570,243 claim Waltham *414 held against New Trident for outstanding debts, and released Bardwell and Stone from all claims Waltham had against those individuals. Subsequently, on June 26, 1972, Bardwell and Stone released Waltham from all claims they possessed against Waltham. Finally, on June 30, 1972, Gross, on behalf of Inductotherm, transferred $10,000 to Danning pursuant to the above Bill of Sale, and the parties acknowledged Inductotherm's receipt of the assets outlined above. As additional consideration for the stock transfer, Inductotherm paid rent arrearages of New Trident of approximately $4,000. Thus, the total consideration paid for New Trident's stock and assets, as outlined above, was $14,000. [11] After *415 Inductotherm's purchase of New Trident's stock, Hotchkin made numerous attempts to determine New Trident's precise tax position with regard to its available net operating losses. On July 19, 1972, Hotchkin wrote to Danning requesting Danning to forward Hotchkin New Trident's prior year's Federal tax returns which stated in pertinent part as follows: In this connection, we should like to determine the tax position of Trident as it is contained in the consolidation of Waltham Industries. In other words, we have a distinct understanding that the losses of Waltham were sizeable and they did not have to avail themselves of the loss of Trident. Mr. Wagner of Ernst & Ernst of New York advises that you have copies of the 1969 and the 1970 consolidated reports for Waltham. If you would be kind enough to furnish us with copies of the reports with the accompanying schedules supporting such, we will be much obliged. If these are not available, would you please authorize the writer to visit the New York office of Ernst & Ernst to extract the same. In any event, we need your approval and cooperation; and, again, I am much in debt asking for same. When Hotchkin's attempts did not produce results, *416 Hotchkin instructed Gross to request the same information. Gross's efforts in this regard were successful and on August 28, 1972, Danning authorized release to Hotchkin of copies of New Trident's 1969 and 1970 income tax returns and supporting documents.
IV. New Trident's Reorganization
Shortly after Inductotherm acquired New Trident's stock and the patent rights outlined above, Inductotherm called a special meeting of New Trident's shareholders for purpose of electing a board of directors for New Trident. At this meeting, Bardwell, Stone and one Agnes Modea were elected to New Trident's board, [12] and this newly established board adopted a resolution authorizing New Trident to file a petition under Chapter XI of the Bankruptcy Act, U.S.C. Title 11, Chapter XV, sections 701-799 (hereinafter the "Chapter XI proceedings"), with the United States District Court in New Jersey. On July 10, 1972, pursuant to the above-referenced resolution, New Trident *417 filed Chapter XI proceedings, and Markowitz was appointed receiver in such proceedings. Subsequently, New Trident filed a plan of arrangement in the Chapter XI proceedings which proposed that the debts of New Trident's general unsecured creditors should be discharged at the rate of twelve and one-half percent of their full allowed claims. While the Chapter XI proceedings were under consideration by the referee, New Trident, on July 16, 1972, filed with the referee an order to show cause why receiver Markowitz should not enter into a licensing agreement with Old Trident Tool with respect to the patents and trademarks owned by New Trident.[13] *418 By order dated August 1, 1972, the referee approved the proposed licensing agreement. Pursuant to this licensing agreement, Old Trident Tool was granted the exclusive right, license and privilege to manufacture, use and sell any product derived from the patents and trademarks, and Old Trident Tool agreed to pay to the receiver a royalty of five percent of net sales. The agreement was made retroactive to March 1972, and was to continue in effect until November 1, 1972. On October 12, 1972, the referee in New Trident's Chapter XI proceedings approved New Trident's plan of arrangement, and this approval was confirmed by order dated November 3, 1972. However, this did not end the matter for New Trident. In early November 1973, unsecured creditors of New Trident filed petitions for review of the referee's confirmation of the Chapter XI plan with the United States District Court in New Jersey, in an effort to defeat the plan and force liquidation of New Trident. Before the District Court had ruled on the above petition for review, Old Trident Tool's board of directors on October 31, 1972, adopted a resolution that Old Trident Tool would be merged into New Trident. On December 29, 1972, a certificate of merger, effective October 31, 1971, was filed with the State of New Jersey which provided in relevant part: *419 1 - All of the assets of Trident Tool Corp. shall be transferred to and become the property of Trident Industries, Inc., the surviving corporation, came to be carried at book value in the books of account of the surviving corporation; and all of the liabilities of Trident Tool Corp. shall be assumed by and become the liability of the surviving corporation, Trident Industries, Inc.
2 - All of the shares of stock of Trident Tool Corp. shall be called in and cancelled and secured to the stock registry book of Trident Tool Corp., same to be placed in safe keeping. Trident Industries, Inc. will issue shares of its common stock, the only class authorized, to the present holders of Trident Tool Corp. stock, pro rata, one (1) share of Trident Industries, Inc. for each share of Trident Tool Corp. common stock heretofore held. 3 - There shall be no amendment needed to the Certificate of Incorporation of the surviving corporation, Trident Industries, Inc., in view of the fact that the heretofore operations and authorities of the merged corporation, Trident Tool Corp., are the same as and are within the powers of the surviving corporation. The number of shares issued and outstanding of Trident *420 Tool Corp. stock are 1,000 shares of common stock, the only class authorized and issued. The shareholders, in a meeting held jointly with the Directors of the corporation, have approved the merger plan as outlined above, unanimously. As noted previously, prior to its merger into New Trident, Old Trident Tool had been conducting business pursuant to a licensing agreement with New Trident. On its Federal income tax return for the period March 1, 1972 to October 31, 1972, Old Trident Tool reported a total net operating loss of $34,979.42, computed as follows: Gross Receipts
$71,765.51 Less: Cost of Goods Sold
(45,479.63)
Gross Profit
26,285.88 Total Income
26,285.88 Deductions: Compensation of Officers
30,000.08 Salaries and Wages
5,210.00 Rents
2,780.00 Taxes
1,730.39 Depreciation
1,291.38 Advertising
2,646.21 Other Deductions
[14] 17,607.24 Net Operating Loss
$34,979.42 Attached to this return was a balance sheet which *421 contained the following information: Assets
Ending Balance
Cash
$141.11 Accounts Receivable
15,831.48 Inventories
11,318.03 Depreciable Assets
28,206.60 Less: Accumulated Depreciation
(1,291.38)
Adjusted Basis
26,915.22 Total Assets
$54,205.84  New Trident had been totally inactive as a business entity between March and November 1972. Although it is not completely clear on this record, apparently New Trident was reactivated subsequent to its merger with Old Trident Tool on October 31, 1972. For its taxable year ending December 31, 1972, New Trident filed a Federal income tax return which reflected a net operating loss of $267,617.61.This claimed net operating loss was computed by New Trident as follows: Gross Receipts
[15] *422 $45,166.00 Less: Cost of Goods Sold
(139,245.14)
Gross Profit
(94,079.14)
Total Income
(94,079.14)
Deductions: Compensation of Officers
[16] 9,100.00 Salaries and Wages
[16] 4,020.02 Rents
[16] 600.00 Taxes
[16] 507.94 Interest
[16] 112.00 Amortization
51,924.98 Depreciation
208.26 Advertising
[16] 2,366.60 Other Deductions
104,698.67 Total Deductions
173,538.47 Net Operating Loss
$267,617.61  New Trident's claimed allowance for cost of goods sold for its year ending December 31, 1972, was computed on its return as follows: Beginning Inventory
$119,669.72
Additions
56,458.35
Total
176,128.07
Less: Ending Inventory
36,882.93
Cost of Goods Sold
$139,245.14
New Trident's claimed deduction for amortization for its year ending December 31, 1972, was computed on its return as follows: Additions
Bal. 1/1/72
To P&L
Bal. 12/31/72
Patents
$1,730.68
$5,109.17
$1,689.81
$5,150.04
Trademarks
357.58
357.58
0
Research & Development
146,940.11
49,877.59
97,062.52
$1,730.68
$152,406.86
$51,924.98
$102,212.56
New Trident's claimed deduction for depreciation for its year ending December 31, 1972, was computed on its return as follows: Assets
Date Acquired
Cost or Other Basis
Method
Life
Depreciation
Machinery &
Other Equipment
Various
$24,588.71
S.L.
10
$208.26
New Trident's claimed deduction for "other deductions" was comprised of the *423 following: [17]
Delivery to Customers
$160.45
Telephone
1,157.13
Travel
1,284.01
Warranty
89.84
Insurance
704.43
Legal
2,176.46
Office Supplies
525.32
Utilities
116.95
Loss Value of Assets
[18] 97,699.19
Sundry
784.89
Total
$104,698.67
Upon Old Trident Tool's merger into New Trident on October 31, 1972, New Trident took up, on its balance sheet, Old Trident Tool's ending asset and liability balances. The following chart represents New Trident's 1972 opening and ending asset balances, as well as that portion of the ending balances which derived from Old Trident Tool's merger into New Trident: 1972
1972
Portion of 1972 End.
Beginning
Ending
Balance Derived From
Assets
Balance
Balance
Old Trident Tool
Cash
($1,717)
$174.70 $141.11 Accounts Receivable
33,423 56,006.34 15,831.48 Inventories
119,670 36,882.93 11,318.03 Other Current Assets
2,780 393.10 Fixed Depreciable Assets
126,538 29,004.71 28,206.60 Less: Accumulated Depreciation
(30,709)
(1,499.64)
(1,291.38)
Adjusted Basis
95,829 27,505.07 26,915.22 Intangible Assets
283,525 275,235.34 Less: Accumlated Amortization
(131,118)
(173,022.78)
Adjusted Basis
152,407 102,212.56 Other Assets
26,212 26,212.59 Total Assets
428,604 249,387.29 $54,205.84 *424 Despite the fact that the referee's confirmation of New Trident's Chapter XI plan was under review in the United States District Court in New Jersey, New Trident, under Bardwell and Stone's direction, continued to operate this business during the first six months of 1973, apparently on a rather informal basis. [19] Finally, on June 18, 1973, the District Court in New Jersey affirmed New Trident's Chapter XI plan. By letter opinion, the Court framed the issues concerning the Chapter XI plan as follows: (1) whether the Referee was clearly erroneous in finding that Inductotherm held an unsecured claim against Trident which qualified it to vote for confirmation of the Arrangement… The Court held: Inductotherm acquired Trident from Waltham Industries by purchasing Trident's stock. In addition to acquiring Trident's assets (which consisted primarily of patents on inventions by Allen E. Bardwell, Trident's past and present chief executive), Inductotherm also took an assignment of a debt owing from Trident to Waltham in the amount of $570,243.30. Petitioners assert that this dabt was, in reality, a capital contribution and, as such, did not entitle Inductotherm to vote as an unsecured creditor. *425 The Referee found that the $570,243.30 was loaned by Waltham to Trident in an effort to make Trident self-sufficient and profitable. This finding of fact is well bottomed in the record. On June 20, 1973, shortly after the District Court affirmed New Trident's Chapter XI plan, Bardwell, Stone and Inductotherm entered into an agreement which provided in relevant part as follows: INASMUCH AS, the first agreement written with respect to A. Eugene Bardwell, Selden A. Stone, and Inductotherm Corp., dated February 28, 1972, has now expired, and While the anticipated and intended total funds from Inductotherm Corp. to Trident Industries was estimated to be $150,000, *426 the total investment and advances by Inductotherm, as of June 22, 1973, has reached $237,435, with $65,000 as capital, and $172,435 in advances. At the time of this writing, June 22, 1973, the company has not been profitable and has continuously called for additional advances from Inductotherm Corp.
At this time, Mr. Selden A. Stone is desirous of resigning as Vice-President of Trident, and proposes to leave the company July 31, 1973, and will receive full salary through that date. Mr. A. Eugene Bardwell and Inductotherm plan to continue the operation of Trident on a basis that will result in profitable operations, necessitating some reduction in expenditures until profitability can be assured. * * * … Mr. Selden A. Stone, under prior Agreements, was to have received certain shares of the Trident stock in consideration of past services and for forbearance on certain claims held by Mr. Stone against Trident Industries, Inc. In order to reach profitability quickly and adequately compensate Mr. Bardwell for his services and responsibilities, and for the value of patents demonstrated to be valuable, the parties agree as follows: (a) Mr. A. Eugene Bardwell's base salary shall be $6,000 *427 per year, subject to additional allowances for royalties stipulated as follows: (1) A royalty of 5% on the first $20,000 dollars of monthly sales, payable in the month following. At the inception of this agreement, the monthly sales for the month of June 1973 preceding the date of this Agreement, will be considered as applicable sales for purposes of this Agreement. (2) An additional royalty will be paid at the rate of 5% on the next $10,000 in sales, provided that the company pre-tax profits, after paying the bonus described in paragraph (1) above, are at least equal to $1,000 a month, payable monthly, before considering royalties in this sub-paragraph (2) as an expense, and commencing with July 1973 operations. (3) A further and additional royalty of 2% on all net sales (including the sales mentioned in categories 1 and 2 above, except for the month of June 1973) -- with the proviso that this third category royalty is subject to a maximum of 30% of the annual pre-taxed profits, after considering royalties earned in (1) and (2) above as expense. In order to complete its obligation on the first Agreement, now expired, and to fulfill this convenant, Inductotherm Corp. will cause *428 to be issued 50 shares of common stock of Trident Industries, Inc. to Mr. Selden A. Stone, and 200 shares of Trident Industries, Inc. common stock to Mr. A. Eugene Bardwell. Hereafter, neither shareholder will have a right to a certain percentage of shares but, rather, will participate in company share distribution in the number of shares rather than percentage thereof. * * * All shares made available to Mr. Selden A. Stone and Mr. A. Eugene Bardwell shall be restricted in that they are to be offered first to the company by either of the selling shareholders, and the company shall have the right of first refusal against any bonafide and confirmed offer. This agreement supercedes the prior Agreement of February 28, 1972, and carries forward those benefits of a continuing nature embodied in the first Agreement. The parties hereto by signature and/or seal intend to be bound. Pursuant to the above agreement, on June 22, 1973, petitioner transferred [20] *429 20 percent of New Trident's outstanding shares to Bardwell, and transferred 5 percent of such shares to Stone. Shortly thereafter, Stone left New Trident's employ. On its Federal income tax return for 1973, New Trident reported a net operating loss of $69,963.38 from its operations for that year, computed as follows: Gross Receipts
$173,688.47 Cost of Goods Sold
(117,463.85)
Gross Profit
56,224.62 Ordinary Gain
246.13 Other Income
5.00 Total Income
56,475.75 Deductions: Compensation of Officers
32,282.42 Salaries and Wages
7,839.24 Rents
4,553.00 Taxes
3,004.77 Interest
4.60 Amortization
41,812.59 Depreciation
2,922.14 Advertising
6,666.71 Other Deductions
27,353.66 Net Operating Loss
(69,963.38)
The claimed cost of goods sold allowance was computed by New Trident as follows: Beginning Inventory
$36,882.93
Additions
202,965.48
Total
239,848.41
Ending Inventory
122,384.56
Cost of Goods Sold
117,463.85
The claimed amortization deduction was computed by New Trident as follows: Bal. 1/1/73
To P&L
Bal. 12/31/73
Patents
$5,150.04
$1,689.81
$3,460.23
Research & Development
97,062.52
40,122.78
56,936.74
102,212.56
41,812.59
60,399.97 The claimed depreciation was computed by New Trident as follows: Date
Cost or
Prior
Depreciation
Asset
Acquired
Other Basis
Depreciation
Method
Life
For This Year
Furniture
and
Fixtures
Various
$1,580.37
220.80
S.L.
10 yr.
269.84
Machirery
and
Equipment
Various
34,351.41
1,278.84
S.L.
10 yr.
2,652.30
35,931.78
2,922.14
On *430 a balance sheet attached to its 1973 return, New Trident showed beginning asset balances identical to its ending asset balances for 1972, and showed the following ending balances for 1973: BALANCE SHEET
Assets
Ending Balance
Cash
$821.24 Accounts Receivable
29,547.64 Inventories
122,384.56 Other Current Assets
106.49 Depreciable Assets
35,931.78 (Accumulated Depreciation)
(4,175.65)
Intangible Assets
275,235.34 (Accumulated Amortization)
(214,835.37)
Total
$245,016.03 V. New Trident's Liquidation
By the year 1974, it became apparent that New Trident was not going to be a success and, during that year, petitioner (having taken over as the parent company from Inductotherm in 1973) decided to liquidate it. On February 25, 1974, petitioner purchased Stone's New Trident shares for total consideration of $500 and on May 21, 1974, purchased Bardwell's New Trident shares for total consideration of $2,000. On September 30, 1974, New Trident's board of directors met to discuss the liquidation of New Trident. At this meeting, the board agreed that the following concepts would be followed in the liquidation of New Trident: That net receivables as of October 31, 1974 will be sold to and conveyed to Mr. Bardwell *431 and/or a company named by him. Accounts payable and accrued liabilities at October 31, 1974 will be satisfied by the company from collections from customers. After transactions are recorded with respect to inventory, the good and acceptable inventory will be sold to Mr. Bardwell at 75% of the acceptable book cost of such inventory. The patents will be conveyed to Mr. Bardwell free of any consideration. All jigs, fixtures and manufacturing tools acquired substantially for the use of Celmar Manufacturing Corporation for the manufacture of Trident parts will be conveyed at no charge to Mr. Bardwell or his company to be named. Furniture and fixtures, and all other fixed assets of value will be retained by Trident for subsequent disposition. Mr. Bardwell is to assume all the costs of customer rejects and complaints in connection with returned parts sold heretofore, and will hold Trident Industries, Inc. or the assigns harmless. In payment for the finally determined price of net receivables after payables are satisfied, an acceptable inventory at the agreed ratio thereof, and the trailer, a note will be issued to Trident Industries, Inc. for the net amount due by Mr. Bardwell in behalf *432 of his company to be named. This note will bear interest at prime rates and will be payable in monthly increments. The amount of the monthly installments, exclusive of interest, will be equal to 20% of the selling price of company sales for the month. Should Mr. Bardwell, or the company to be named, cease the replacement of inventory and decide to abandon the tool bit business and being in a program of liquidation, the payments on the note will be made at the rate of 50% of the selling price each month. As collateral for the note to be issued, Mr. Bardwell and/or his company to be named will pledge the entire inventory of tool bits, forgings, buttons, and any parts thereof comprising the stock in trade then on hand or thereafter acquired. Mr. Bardwell and/or his company agrees to execute a financing statement in order that this may be made a part of the public record at the site where the inventory is maintained. Mr. Bardwell, on behalf of his company and as an officer therein, agrees to furnish to Trident Industries, Inc. or its assigns, quarterly financial statements consisting of statements of financial position and income statement for the current quarter reported upon and *433 for the period to date within the financial year of the company. Mr. Bardwell recognizes that formal accounts shall be maintained and that books and records shall be open for inspection to representatives of Trident Industries, Inc. or its assigns, on any reasonable business hour upon notice duly made. Trident Industries, Inc. will plan to liquidate as of October 31, 1974 on the above precepts if approval of the Board of Directors is made by all related entities.
On October 21, 1974, petitioner's board of directors resolved that New Trident would be liquidated and authorized Hotchkin to proceed with selling the assets and disposing of the contracts of the company appropriately. Bardwell then formed a corporation called Trident Tool Corporation (hereinafter "New Trident Tool"), and, on New Trident Tool's behalf, executed an interest bearing note in the amount of $73,324.25 payable to New Trident for the purchase of the items listed in the immediately preceding paragraph. [21] *434 On October 31, 1974, New Trident was liquidated into petitioner. Petitioner received the above-referenced $73,324.25 note on this liquidation plus additional assets described infra.
On its Federal income tax return for its year ending October 31, 1974, New Trident reported a net operating loss of $184,297.44 from its operations for that period, computed as follows: Gross Receipts
$90,498.66 Cost of Goods Sold
133,343.75 Gross Profit
(42,845.09)
Ordinary Loss
(5.18)
Total Income
(42,850.27)
Deductions: Compensation of Officers
8,263.98 Salaries and Wages
11,743.04 Bad Debts
3,990.00 Rents
3,200.00 Taxes
1,478.92 Interest
25.13 Amortization
45,870.72 Depreciation
2,741.63 Advertising
2,887.83 Other Deductions
61,245.92 Total Deductions
141,447.17 Net Operating Loss
(184,297.44) The claimed allowance for cost of goods sold was computed by New Trident as follows: Beginning Inventory
$122,384.56
Additions
83,283.44
Total
$205,668.00
Ending Inventory
72,324.25
Cost of Goods Sold
$133,343.75
The claimed amortization deduction was computed by New Trident as follows: 1-1-74
To P & L
10-31-74
Patents
$3,460.23
$1,408.12
$2,052.11
Research and
Development
56,939.74
44,462.60
12,477.14
$60,399.97
$45,870.72
$14,529.25
The claimed depreciation deduction was computed by New Trident as follows: Date of
Cost or
Prior
Depreciation
Asset
Purchase
Other Basis
Depreciation
Method
Life
For This Year
Furniture &
Fixtures
Various
$1,565.37
$242.19
S.L.
10
$118.50
Machinery &
Equipment
Various
35,601.41
3,931.14
S.L.
10
$2,623.13
$37,166,78
$4,173.33
$2,741.63
Included *435 in the above-claimed deduction for "other deductions" in the tax return was a claimed deduction of $42,152.07 for "Loss on Sale of Assets in Dissolution." [22] This claimed deduction resulted from New Trident's computation of its loss upon the sale of its assets to New Trident Tool pursuant to the agreement of September 30, 1974. The total loss of $42,152.07 was computed as follows: Claimed
Amount
Gain or
Asset
Adjusted Basis
Realized
Loss
Accounts Receivable from
New Trident Tool
0
$1,629
$1,629    Inventory
$72,324.25
54,243.19
(i.e. 75 % value)
(18,081.06)
Patents and R & D
14,529.25
0
(14,529.25)
Depreciable Assets
30,251.82
$19,081.06
(11,170.76)
Total Loss:
($42,152.07)
When New Trident was liquidated on October 31, 1974, it had assets and liabilities (other than the alleged debt for advances from petitioner and Inductotherm) with book values as follows: Account
Assets
Liabilities
Cash
$953.95
Accounts Receivable
21,353.80
Accounts Receivable - Trident Tool
1,629.00
Notes Receivable - Trident Tool
73,324.25
Accounts Payable - Trade
$8,590.07
Accounts Payable - Inter Company
6,439.71
Federal Income Tax Withheld
306.48
Accrued FICA Tax
252.54
Accrued N.J. Sales Tax
375.40
Accrued Property Tax
241.58
Total
$97,261.00
$16,205.78
*436 VI. Old Trident Tool's and New Trident's Capital/Debt Structure
During all years relevant herein, Inductotherm and petitioner maintained on their books two separate asset accounts which purported to reflect and characterize transfers of funds to their subsidiaries. The first asset account was labled account number 757 and was captioned "Inter-company Loans Deferred." (This account will hereinafter be referred to as account number 757). The second asset account was labled account number 766 and was captioned "Investment in Subsidiaries." (This account will hereinafter sometimes be referred to as account number 766). Old Trident Tool and New Trident maintained on their books and records an account labled "Due to Inductotherm." This account purported to be a liability account. As previously indicated, shortly before Old Trident Tool was formed, Bardwell and Stone entered into an agreement with Inductotherm concerning the proposed financing of Old Trident Tool's operations. In essence, this agreement provided that Inductotherm would advance to Old Trident Tool necessary funds for operations and stated that it was anticipated that these advances would not exceed $150,000. It was also *437 agreed that such funds would be advanced by Inductotherm to Old Trident Tool "on interest bearing notes, stated at Inductotherm's prime." [23]
When Old Trident Tool was formed in March 1972, it was capitalized with only $1,000. From the time of Old Trident Tool's creation until October 31, 1972, when it was merged into New Trident, petitioner advanced to Old Trident Tool a total of $79,328.67. Although the above-referenced agreement stated that any funds advanced to Old Trident Tool would be advanced on interest bearing notes, no notes were issued by Old Trident Tool evidencing any portion of these advances. Moreover, no interest was ever paid by Old Trident Tool to Inductotherm with respect to them. The advances were used by Old Trident Tool to meet operating expense requirements. The $79,328.67 which was advanced by Inductotherm to Old Trident Tool was carried by Inductotherm in account number 757 and was carried in Old *438 Trident Tool's "Due Inductotherm" account. On a balance sheet attached to its Federal income tax return for its short year March 1, 1972 to October 31, 1972, Old Trident Tool reflected a total asset ending balance of $54,205.84. This balance sheet also reflected outstanding liabilities and capital stock as follows: Liabilities
Amount
Accounts Payable
$621.15
Other Current Liabilities
8,235.44
Loans from Stockholders
79,328.67
Capital Stock
1,000.00
When Waltham conveyed New Trident's shares to Inductotherm in June 1972, in exchange for, inter alia, $10,000, plus rent arrearages, Inductotherm posted this $10,000 to its investment account number 766. No cash contributions to New Trident's capital were made at this time. Subsequently, when Old Trident Tool was merged into New Trident, Old Trident Tool's outstanding "debt" to Inductotherm of $79,328.67, plus the $1,000 capital contribution made to Old Trident Tool upon its formation, were carried over to New Trident's books and reflected as "debt" due Inductotherm. After the merger of October 31, 1972, and before December 31, 1972, additional advances were made by Inductotherm to New Trident totaling $24,000 for operating capital requirements. *439 These advances were posted by Inductotherm in its account number 757, and were carried in New Trident's "Due Inductotherm" account. However, no notes were issued with respect to these advances, and no interest was ever paid thereon by New Trident. On a balance sheet attached to New Trident's 1972 Federal income tax return, New Trident reflected a total ending asset balance of $249,387.29.[24] Additionally, this balance sheet reflected ending liability, surplus and capital stock balances as follows: Liability
Amount
Accounts Payable
[25] *440 $300,104.11 Morgages, Notes, Bonds Payable in
Less Than 1 Year
[26] 54,956.11 Other Current Liabilities
[27] 52,147.32 Loans from Stockholders
[28] 698,471.39 Paid in or Capital Surplus
460,502.09 Retained Earnings - Unappropriated
(1,316,893.73)
Capital Stock
100.00 Total Liabilities &
Stockholder's Equity
$249,387.29  From January 1973, until June 23, 1973, Inductotherm and/or petitioner continued to advance funds to New Trident to meet New *441 Trident's operating capital requirements. These advances were all posted to Inductotherm or petitioner's intercompany loan account number 757, and to New Trident's liability account labeled "Due Inductotherm." However, no notes were ever issued by New Trident evidencing these advances, and no interest was ever paid by New Trident to Inductotherm or petitioner with respect to these advances. The advances were made in the following amounts on the following dates: Date of Advance
Amount
January 1, 1973
$6,000.00
February 22, 1973
8,000.00
March 15, 1973
1,000.00
March 28, 1973
2,000.00
March 31, 1973
8,064.35
March 31, 1973
42.00
April 4, 1973
40,000.00
April 25, 1973
3,000.00
Total
$68,106.35
Shortly after the United States District Court in New Jersey affirmed New Trident's Chapter XI plan in June 1973, Bardwell, Stone and petitioner entered into an agreement which superseded the agreement of February 28, 1972, as hereinabove described. This agreement acknowledged that total investments and advances by Inductotherm as of June 22, 1973, had reached $237,435 (with $65,000 as capital [29] and $172,435 [30] in advances). During the remainder of 1973, petitioner advanced to New Trident $30,000, and this amount *442 was recorded in petitioner's account number 757 and New Trident's "Due Inductotherm" account. However, no notes were issued by New Trident with respect to this amount, and no interest was ever paid thereon. Thus, by the end of 1973, petitioner and Inductotherm had made advances totaling $202,435.02 to Old Trident Tool and New Trident, and no amounts of such advances had been repaid. Before the close of New Trident's 1973 tax year, petitioner forgave New Trident's $570,243.30 debt which was assigned to Inductotherm when it purchased New Trident's *443 stock. Additionally, New Trident apparently satisfied all other outstanding liabilities which it had incurred prior to the acquisition, pursuant to the above-described Chapter XI plan (i.e. at 12 1/2 percent of the allowed claims of unsecured creditors). New Trident's treatment of the forgiveness and satisfaction of these debts on its books was explained by Hotchkin in New Trident's 1973 annual report as follows: With the acceptance of the Chapter IX [sic] plan of arrangement, funded by the stockholders, net liabilities in the amount of $932,527.74 were taken up in Paid in Surplus. New Trident did not adjust the basis of its assets to reflect any indebtedness discharged in bankruptcy. New Trident's 1973 return contained an "adjustment" to its claimed net operating loss carryovers from prior years as follows: Adjustment for forgiveness of indebtedness - ($71,280.41) This "adjustment" represents New Trident's treatment of petitioner's discharge of $570.243 debt which was assigned to Inductotherm when it purchased New Trident's stock. That is, New Trident reduced its claimed net operating losses from prior years by $71,280.41, or 12 1/2 percent of $570,243. New Trident's 1973 Federal *444 tax return reflected a total ending asset balance of $245,016.03, [31] and ending liability, surplus and capital stock balances as follows: Liability
Amount
Accounts Payable
$12,270.98
Other Current Liabilities
1,019.67
Loans from Stockholders
225,452.66
Capital Stock
$100.00
Paid in or Capital Surplus
1,393,029.83
Retained Earnings - Unappropriated
(1,386,857.11
Total Liabilities & Stockholder's Equity
$245,016.03
From January 1974, until October 31, 1974, petitioner made advances to New Trident totaling $91,346.52, as follows: Date of Advance
Amount
March 1974
$34,701.60
March 1974
20,000.00
April 1974
19,000.00
After April 1974
11,800.00
August 1974
3,200.00
October 1974
2,644.92
Total
$91,346.52
These advances were entered on petitioner's account number 757 and New Trident's "Due Inductotherm" account. As with the other advances, howevr, no notes were issued by New Trident, and no interest was paid thereon. When petitioner purchased Bardwell's and Stone's New Trident shares for $2,000 and $500 respectively, as discussed supra, it entered the purchase price for these shares on its account number 766. Thus, when New Trident was liquidated *445 at the end of October 1974, both New Trident's and petitioner's books and records indicated that New Trident was indebted to petitioner in an amount in excess of the liquidation proceeds. More precisely, New Trident's books indicated total indebtedness to petitioner of $293,781.54 on the liquidation date. On its books, petitioner entered a loss on the liquidation of New Trident of $225,226.32 computed as follows: Loans Outstanding
$ (293,781.54)
Investment in Trident
(12,500.00)
Note Receivable
73,324.25 Dissolution Control
7,730.97 Total Loss
($225,226.32)
On its Federal income tax return for its fiscal year ending April 30, 1975,petitioner claimed as a net operating loss carryover from New Trident, a total deduction of $1,117,229.40, calculated by petitioner as follows: Net Operating Loss Deduction of Trident Industries, Inc.
FYE 12/31/70
$310,408.00
FYE 12/31/71
321,243.96
FYE 12/31/72
302,597.03
FYE 12/31/73
69,963.38
FYE 12/31/74
184,297.44
Sub Total
$1,188,509.81
Less: "Adjustment
for Forgiveness of
Indebtedness"
$71,280.41
Total
$1,117,229.40 In addition to the above net operating loss deduction, petitioner, on its fiscal year ending April 30, 1975 return, deducted as "other deductions" a total amount *446 of $1,214,374.92. On a supplementary schedule attached to its return, petitioner listed a breakdown of this $1,214,374.92 figure. Included in this breakdown was a deduction for the loss petitioner allegedly sustained upon its liquidation of New Trident totaling $225,226.32, as described above. In the statutory notice of deficiency herein, respondent determined a $524,863.99 deficiency for petitioner's fiscal year ending April 30, 1975. This deficiency resulted from respondent's disallowance of, inter alia, petitioner's claimed net operating loss carryover deduction from New Trident and respondent's disallowance of petitioner's claimed deduction for its alleged loss from the liquidation of New Trident. In its petition herein, petitioner, inter alia, contested respondent's disallowance of $1,059,903.40 of petitioner's claimed net operating loss carryover deduction. In the alternative, petitioner claimed that it was entitled to the full deduction of $225,226.32 as a loss incurred upon liquidation of New Trident. OPINION Respondent contends the petitioner is not entitled to any portion of the net operating loss carryover deductions from New Trident claimed by it on its fiscal 1975 *447 Federal income tax return. In support of this contention, respondent advances three arguments. First, respondent argues that New Trident was insolvent on the date of its liquidation, and therefore contends that Inductotherm (petitioner's predecessor) did not receive New Trident's assets in a transaction which qualified under section 381. If this position is correct, petitioner would not be entitled to succeed to New Trident's tax attributes, as specified in section 381(c). Second, respondent argues that the purchase of New Trident's stock by Inductotherm was motivated principally by tax evasion or avoidance considerations and contends that petitioner is therefore precluded by section 269 from utilizing any of the net operating losses at issue herein. Third, respondent argues that petitioner's claimed net operating losses should be disallowed in any event on the ground that petitioner has failed to substantiate the amount and deductibility of the expenses that generated such losses. Respondent additionally contends that petitioner is not entitled to a deduction of $225,226.32 for a "loss on the liquidation" of New Trident as claimed on its fiscal 1975 return. In support of this *448 contention, respondent argues that such loss should be disallowed under section 269 or, alternatively, for petitioner's failure to substantiate such loss. Petitioner contests each of respondent's assertions regarding the net operating loss carryovers at issue herein and accordingly contends that it is entitled to such losses. More precisely, petitioner contends that all advances made by petitioner and its predecessor to New Trident and Old Trident Tool should be characterized as equity rather than debt, and maintains that if such advances are so characterized, New Trident was solvent on the date of its liquidation and the liquidation therefore qualified under section 381. Alternatively, petitioner maintains that if New Trident was insolvent on the date of its liquidataion, petitioner should be entitled to claim a deduction of $225,226.32 for its fiscal year ending 1975 as an ordinary loss from the liquidation of New Trident, under either section 165(g)(3), (worthless stock) or section 166(a)(1), (bad debt). Finally, petitioner claims section 269 is inapplicable to the facts of this case. We shall address the issues relating to the deductibility of the net operating loss carryovers *449 involved herein, first considering the problems presented by section 381, and, thereafter, the problems under section 269. Our disposition of these matters will also dispose of the other contentions raised by the parties. A. Section 381 Issue
Section 381[32] *450 provides a set of rules that govern the carryover of, or succession to, specific tas attributes, including net operating loss carryovers, following certain categories of corporate asset acquisitions. Included in these categories is the acquisition of assets upon the liquidation of a subsidiary under sections 332[33] *451 and 334(b)(1). Section 381(a)(1). The parties in this case agree that petitioner would not be entitled to claim any of the net operating losses at issue herein, unless petitioner received New Trident's assets in a liquidation qualifying under section 332 as provided by section 381(a)(1). Thus, we must first consider the definitional requisites of section 332. Section 332(b)(2) provides that in order for a liquidation to qualify under that section, the liquidating distribution by the subsidiary must be in complete cancellation or redemption of its stock. Section 1.332-2(b), Income Tax Regs., reiterates this rule as follows: (b) Section 332 applies only to those cases in which the recipient corporation receives at least partial payment for the stock which it owns in the liquidating corporation. * * * If a subsidiary is insolvent on the date of its *452 liquidation, all corporate assets will necessarily be absorbed by outstanding indebtedness prior to any distribution with respect to its stock. For this reason it has been held that the liquidation of an insolvent subsidiary cannot qualify as a valid section 332 liquidation. See Spaulding Bakeries, Inc. v. Commissioner,27 T.C. 684, 688 (1957), affd. 252 F.2d 693 (2d Cir. 1958); Iron Fireman Manufacturing Co. v. Commissioner,5 T.C. 452, 462 (1945); cf. Swiss Colony, Inc. v. Commissioner,52 T.C. 25, 35 (1969), affd. 428 F.2d 49 (7th Cir. 1970). Accordingly, the qualification of petitioner's liquidation of New Trident under section 332 depends upon a threshold determination of whether New Trident was solvent or insolvent on the liquidation date.
In determining whether a subsidiary is insolvent for purposes of section 332, the fair market value of its assets must be compared to its existing liabilities. Swiss Colony, Inc. v. Commissioner,52 T.C. at 35; cf. Northern Coal & Dock Co. v. Commissioner,12 T.C. 42, 47 (1949). If the fair market value of the subsidiary's assets exceeds the amount of its liabilities on the liquidation date, the subsidiary is solvent, and the corporation *453 which receives all of the assets of the liquidated subsidiary has received payment for its stock in the subsidiary, within the meaning of section 332(b)(2) and section 1.332-2(b), Income Tax Regs. See Swiss Colony, Inc. v. Commissioner,52 T.C. at 35. [34]
To this point, the parties are not in disagreement. Beyond this point, however, there is very little agreement. Respondent contends that New Trident was clearly insolvent on the date of its liquidation. In support of this contention, respondent argues that the bulk of the advances made by petitioner and Inductotherm (its predecessor) to Old Trident Tool and New Trident during 1972-1974, and which remained outstanding when New Trident was liquidated, should be characterized as debt for Federal tax purposes. If such advances, in fact, constituted indebtedness, New Trident's outstanding liabilities clearly exceeded the value of its assets on the liquidation date, and the company was therefore insolvent at that time.Petitioner, on the other hand, contends that all advances made by petitioner and Inductotherm to Old Trident Tool and New Trident should be characterized as equity investments *454 rather than debt for Federal tax purposes. If all such advances are characterized as equity, the value of New Trident's assets would have exceeded its outstanding liabilities on the date of its liquidation and the company would therefore have been solvent at that time. [35]
Thus, this case offers for our determination the often-litigated issue whether advances made by a shareholder *455 to a controlled corporation should be characterized as debt or equity for Federal tax purposes. The context in which this issue arises in the present case, however, is somewhat unusual, in that here petitioner, rather than respondent, is contending for equity rather than debt classification. Of course, this "role reversal" in no way alters the applicable substantive principles. Wilshire & Western Sandwiches, Inc. v. Commissioner,175 F.2d 718, 721 (9th Cir. 1949), revg. a Memorandum Opinion of this Court; Georgia-Pacific Corp., Transferee v. Commissioner,63 T.C. 790, 795-796 (1975); Ragland Investment Co. v. Commissioner,52 T.C. 867, 875 (1969), affd. per curiam, 435 F.2d 118 (6th Cir. 1970); J.A. Maurer, Inc. v. Commissioner,30 T.C. 1273, 1289 (1958). Although the characterization of amounts advanced to a corporation as debt or equity is important in numerous Federal tax contexts, and this issue has therefore generated a proliferation of case law, no singular approach with a clearly defined set of standards to be uniformly applied has been articulated. In general, the resolution of the debt vs. equity issue in the decided cases involves a comparison of the advances in issue *456 with a list of factors thought to be characteristic of true debt or equity. But a variety of factors have been enumerated by the various courts and apparently unequal weight has been afforded these factors in similar factual contexts. [36] See, e.g., Fin Hay Realty Co v. United States398 F.2d 694 (3d Cir. 1968); J.S. Biritz Construction Co. v. Commissioner,387 F.2d 451 (8th Cir. 1967), revg. a Memorandum Opinion of this Court; Foresun, Inc. v. Commissioner,348 F.2d 1006 (6th Cir. 1965), affg. 41 T.C. 706 (1964). Given the varying approaches that have been applied in identifying and weighing the applicable factors, we will look to the approach taken by the Court of Appeals for the Third Circuit so that our decision herein will be consistent with the views of that Court. [37] Cf. Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 376 (1973). In Fin Hay Realty Co. v. United States,supra at 696, the Court of Appeals for the Third Circuit enumerated sixteen *457 criteria by which to judge the true nature of an investment which is debt in form. The Court cautioned, however, that such factors were not intended to attain talismanic significance, but rather are: * * * only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship.[Fin Hay Realty Co. v. United States,supra at 697] See also Scriptomatic, Inc. v. United States,555 F.2d 364, 367 (3d Cir. 1977). Moreover, the Court in Fin Hay Realty Co. indicated that factors such as formal documentation are insufficient in themselves to establish the existence of a valid debt for tax purposes where the advances are made to a closely held corporation. The Court stated (at 697): In a corporation which has numerous shareholders with varying interests, the arm's-length relationship between the corporation and a shareholder who supplies funds to it inevitably results in a transaction whose form mirrors its substance. Where the corporation is closely held, however, and the same persons occupy both sides of the bargaining *458 table, form does not necessarily correspond to the intrinsic economic nature of the transaction, for the parties may mold it at their will with no countervailing pull. * * * Labels, which are perhaps the best expression of the subjective intention of parties to a transaction, thus lose their meaningfulness. Upon review of Fin Hay Realty Co. and the other numerous cases in this area, we think that the determinative questions, to which an evaluation of the various independent factors should ultimately be directed, are whether, as an objective matter, the parties genuinely intended to create debt obligations, payable in any event and not merely at the risk of the business, and whether the formation of such a relationship was economically reasonable at the time the advances were made. In resolving these questions, we consider no single factor to be controlling. As an initial matter, despite respondent's almost exclusive reliance upon the formal indicia of indebtedness evidenced herein, [38] we do not consider such labels to be controlling with respect to resolution of either of the question in this case. It is true that shortly before the formation of Old Trident Tool, Inductotherm *459 entered into an agreement which provided that it would advance to Old Trident Tool its working capital requirements, and that such advances would be made on "interest bearing notes at Inductotherm's prime." It is equally true that all advances at issue herein were entered on the books of Inductotherm, petitioner, Old Trident Tool and New Trident, as debt rather than capital, and that these book characterizations of the amounts advanced were consistent with certain actions of the board of petitioner authorizing such advances as "loans." However, Old Trident Tool was solely owned by Inductotherm during its entire existence, and it could therefore designate as loans any portion of the advances to Old Trident without diluting its proportionate equity interest in that entity. ( Fin Hay factor nos. 2, 3, 9.) Under these circumstances, as stated above, the formal characterizations of the parties must be closely scrutinized to determine, from all the objective circumstances, the genuineness of the professed intent to create a debtor-creditor relationship, as well as the intrinsic economic character of the advances. Fin Hay Realty Co. v. United States,supra at 697. See also Donisi v. Commissioner,405 F.2d 481, 483 (6th Cir. 1968), *460 affg. a Memorandum Opinion of this Court; Road Materials, Inc. v. Commissioner,407 F.2d 1121, 1124 (4th Cir. 1969), affg. and remanding a Memorandum Opinion of this Court; P.M. Finance Corp. v. Commissioner,302 F.2d 786, 789 (3d Cir. 1962), affg. a Memorandum Opinion of this Court. Moreover, although petitioner transferred a total of 25 percent of New Trident's shares to Bardwell and Stone on June 23, 1973, it is clear that advances made to New Trident subsequent to these stock transfers were made under conditions of financial crisis for New Trident. [39] *462 Therefore, even assuming that there was genuine disproportionate ownership of New Trident from June 23, 1973, until May 21, 1974, (when petitioner repurchased all other outstanding shares of New Trident), we do not afford such disproportionality significant evidentiary weight in this case since, under circumstances of financial crisis, majority shareholders may inject into the failing corporation what is, in economic substance, capital (in the guise of loans), in an effort to salvage their equity position, without regard to whether other shareholders do the same. See, e.g., Zivnuska v. Commissioner,33 T.C. 226, 228, 235 (1959); *461 Bihlmaier v. Commissioner,17 T.C. 620, 626 (1951). In light of the foregoing, we cannot accept the above indicia of indebtedness to be determinative of the Federal tax classification of the advances here in issue. We must therefore look to other objective factors in resolving the present controversy. Upon review of such factors, we think it clear that petitioner and Inductotherm did not genuinely intend to create debts when they advanced funds to Old Trident Tool and New Trident. Moreover, it is equally clear that such amounts were placed at the risk of the business as a matter of economic reality. Accordingly, these advances constituted venture capital and must be treated as such for Federal tax purposes. We base our conclusion as to the genuineness of the "lenders'" intention to create debts upon an analysis of the following factors as applied to the advances at issue herein: First, despite the recitals in the agreement of February 28, 1972, no notes were issued. (Fin *463 Hay factor no. 7.) Second, no fixed maturity date was established for repayment of the advances either in the agreement of February 28, 1972, or otherwise. In fact, in uncontradicted testimony, petitioner's witness stated that no fixed date for repayment of the advances was ever contemplated. (Fin Hay factor no. 13.) See also Stinnett's Pontiac Service, Inc. v. Commissioner,730 F.2d 634 (11th Cir. 1984). Third, no security was provided with respect to any advances here in issue. Since the business of New Trident had a history of losses, the failure of Inductotherm or petitioner to demand security for their advances casts substantial doubt on the genuineness of their intention to act like bona fide creditors. (Fin Hay factor no. 8.) See also Jewell Ridge Coal Corp. v. Commissioner,318 F.2d 695, 699 (4th Cir. 1963), affg. a Memorandum Opinion of this Court; Gilbert v. Commissioner,262 F.2d 512, 514 (2d Cir. 1959), affg. a Memorandum Opinion of this Court, cert. denied, 359 U.S. 1002 (1959).
Fourth, although the agreement of February 28, 1972, stated that funds would be advanced on interest bearing notes "stated at Inductotherm's prime," as stated above, no such notes were ever *464 issued. Moroever, no interest was ever paid by either Old Trident Tool or New Trident with respect to any of the advances; nor were any amounts either accrued as interest with respect to such advances on Old Trident Tool's or New Trident's books, or deducted by those entities on their Federal tax returns. This attitude of ignoring arguably prescribed interest charges is, in the context of this case, strong evidence that the advances here concerned did not constitute true debt. (Fin Hay factor no. 10.) As stated by the Fifth Circuit Court of Appeals in Curry v. United States,396 F.2d 630, 634 (5th Cir. 1968), cert. denied, 393 U.S. 967 (1968): "a true lender is concerned with interest." See also Texas Farm Bureau v. United States, F.2d     (5th Cir. 1984), 84-1 USTC par. 9247, 53 AFTR 2d 84-856; Stinnett's Pontiac Service, Inc. v. Commissioner,supra.
Fifth, no portion of the principal amount of the outstanding advances at issue ehrein were repaid by Old Trident Tool or New Trident prior to New Trident's liquidation.Although it is true that it is the intent at the time of the advances which is the relevant inquiry herein, see Diamond Brothers Co. v. Commissioner,322 F.2d 725, 731 (3d Cir. 1963), *465 subsequent payment history may be indicative of such initial intention. Cf. Wilbur Security Co. v. Commissioner,279 F.2d 657, 662 (9th Cir. 1960), affg. 31 T.C. 938 (1959). This failure of Inductotherm or petitioner to require repayment of any portion of the alleged principal advances is therefore indicative of an intention not to act like a bona fide creditor. Moreover, the failure to demand repayment of any portion of the principal advances, in conjunction with the failure to charge interest on the advances as outlined above, effectively subordinated any existing rights of Inductotherm and petitioner for repayment, to Old Trident Tool's and New Trident's general trade creditors.This de facto subordination casts additional doubt on the original intention to assert the rights of a bona fide creditor. (Fin Hay factor no. 8.) See also Texas Farm Bureau v. United States,supra.
The above circumstances uniformly point to the conclusion that Inductotherm (and later petitioner) did not genuinely intend to form a true debtor-creditor relationship with Old Trident Tool or New Trident. To the contrary, it is apparent that the advances here in issue were intended to be placed subject to *466 the risks of the business. Even if it could be argued that Inductotherm and petitioner did genuinely intend to treat the advances as debt, this would not and the inquiry. As indicated above, the ultimate question is whether the advances, as a matter of economic reality, constituted risk capital subject to the fortunes of the venture. In the present case, the circumstances under which the advances were made, as well as the use to which the funds were employed, demonstrate that such advances, in substance, bore a substantial risk of the enterprise. The economic realities therefore dictate that the advances be treated as equity for Federal tax purposes. (Fin Hay factor nos. 4, 5, 6, and 16); see also P.M. Fiannce Corp. v. Commissioner,302 F.2d at 790; Nassau Lens Co. v. Commissioner,308 F.2d 39, 47 (2d Cir. 1962), remanding 35 T.C. 268 (1960). We base our conclusion relating to the economic reality of the advances upon an analysis of the following factors: One factor tending to show that repayment of the advances, and payment of interest on the advances, if contemplated at all, was solely dependent upon the risk of the business, is the use to which the funds were employed. (Fin *467 Hay factor no. 16.) Old Trident Tool was formed for purposes of continuing the business theretofore carried on by New Trident. However, it was clear at that time that the business of New Trident could not be self-sustaining. During its prior existence, New Trident had almost unfailingly produced losses and, at the time of the formation of Old Trident Tool, was in bankruptcy proceedings. Nevertheless, Old Trident Tool was capitalized with only $1,000, and it was effectively acknowledged that this minimal capital would be insufficient to meet the needs of the enterpirse. As stated in the agreement of February 28, 1972: * * * in addition to the invested capital by Inductotherm Corp., Trident Tool Corp. will call upon Inductotherm to support it in working capital requirements. * * * It is envisioned that the first years advances will not be in excess of $150,000 * * *. Moreover, when Inductotherm acquired New Trident, it provided New Trident with only nominal additional capital of $100, although it was apparent at that time that further operating funds would be needed for that company to continue in existence. This was not the acquisition of a proven operation already established *468 in a dominant position in its market and generating significant operating profits, with no requirements of further development costs. To the contrary, New Trident had a history of losses and was in bankruptcy when acquired by Inductotherm. Moreover, it was apparent from the outset that New Trident would need to rely upon Inductotherm for substantial financial support in order to reestablish operations. Contrast Scriptomatic, Inc. v. United States,supra;Litton Business Systems, Inc. v. Commissioner,supra.
It has been recognized that purported loans such as these, made to a business which has not demonstrated a capacity for making a profit, for such basic needs as day-to-day working capital, without which the corporation could not have carried on its business, are, by their very nature, placed at risk of the business. See Gustin v. Commissioner,412 F.2d 803, 804 (6th Cir. 1969), affg. a Memorandum Opinion of this Court. The failure of Inductotherm, and later petitioner, to provide Old Trident Tool or New Trident with equity capital sufficient for those companies to carry on their planned operations, but rather, continuously advancing funds for such purpose, is therefore a strong *469 indication that the advances were, in reality, the capital which should have otherwise been provided. Arlington Park Jockey Club v. Sauber,262 F.2d 902, 906 (7th Cir. 1959). A second factor which suggests that the advances were placed at the economic risk of the business is the fact that, when the advances were made, there could have been no reasonably anticipated source out of which the advances could have been repaid within a reasonably foreseeable time. This factor somewhat overlaps with the first in that, since the advances themselves were essential to the continuing operation of the enterprise, they could not be reasonably auticipated to constitute a source from which repayment could be made. Moreover, we think the evidence is clear in this case, that, at the time of the advances, it could not be projected that the advances, or interest thereon, could be repaid out of expendable assets or soundly anticipated cash flow of Old Trident Tool or New Trident. Rather, such payment could only be assured if the theretofore unsuccessful business of these companies turned around and began generating profits. Under these circumstances, the advances were at risk. Cf. Scriptomatic, Inc. v. United States.supra. *470 Additionally, at the time of Old Trident Tool's merger into New Trident, the referee in New Trident's bankruptcy had confirmed its Chapter XI plan. However, until June 1973, the confirmation of the plan was pending on appeal with the District Court in New Jersey, and during the appeal period New Trident was therefore effectively a bankrupt. Nevertheless, Inductotherm or petitioner continued to advance funds to New Trident during this period. The advances which were made subsequent to June 1973, were made after Old Trident Tool had been steadily losing money and the shaky financial status of New Trident was acknowledged in the agreement of June 23, 1973, wherein it was stated: At the time of this writing, * * * [New Trident] has not been profitable and has continuously called for additional advances from Inducototherm. It could therefore not be reasonably expected that, at any time during the period of operations of Old Trident Tool and New Trident, there would be expendable assets generated by the operation of those businesses in excess of those necessary to keep them in operation. Moreover, in light of New Trident's history of financial failure, as well as that company's continuing *471 inability to generate a positive cash flow, as outlined supra, it is clear that, at the time the advances were made, their repayment was speculative in the extreme and as such constituted risk capital. See Diamond Brothers Co. v. Commissioner,322 F.2d at 732; Arlington Park Jockey Club v. Sauber,supra at 905-906; Berkowitz v. United States,411 F.2d 818, 821 (5th Cir. 1969). The final factor we consider relevant in this case in determining the economic substance of the advances at issue, has been called the "independent creditor test." (Fin Hay factor no. 4.) This factor requires an inquiry into whether an unrelated party would have extended credit under similar circumstances and terms as the advances in issue. As stated by the Court of Appeals for the Third Circuit, "if the shareholder's advance is far more speculative than what an outsider would make, it is obviously a loan in name only." Fin Hay Realty Co. v. United States,supra at 697.
In the present case it is clear that no independent creditor, genuinely concerned with repayment of his investment, as well as a return on such investment in the form of interest, would have agreed to make these advances on an unsecured basis, *472 setting no definitive maturity date for repayment, at the inception of Old Trident Tool. Certainly, it would not have continued advancing funds when it became apparent that no interest payments would be forthcoming. The business of New Trident had been consistently losing money prior to its association with petitioner, and during the years of the advances, the financial condition of this company steadily deteriorated. These circumstances lead us to conclude that no responsible creditor would have advanced funds on an unsecured basis as Inductotherm and petitioner did herein. In summary, petitioner has adequately demonstrated that, at the time the advances here in issue were made, no genuine intention existed to form a true debtor-creditor relationship and the parties' actions, as well as the economic realities, comported with this fact. We therefore conclude that such advances must be treated as venture capital. Accordingly, the value of New Trident's assets exceeded the value of its outstanding liabilities on the date of its liquidation, and such liquidation therefore qualified under sections 332 and 334(b)(1). Petitioner is thus not precluded by section 381(a) from claiming *473 the net operating loss carryovers from New Trident's prior operations, and respondent must therefore look elsewhere to support his determination. [40] B. Section 269 (1) Application
Respondent contends that even if New Trident was solvent when it was liquidated, *474 all of the net operating losses at issue herein should nevertheless be disallowed under section 269(a)(1).
Section 269(a)(1)[41] *475 provides that if any person acquires control of a corporation, and the "principal purpose" for which such acquisition is made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit or other allowance which such person or corporation would not otherwise enjoy, respondent may disallow such deduction, credit or other allowance. For purposes of section 269, a "person" is defined to include a corporation. Section 7701(a)(1). For tax avoidance to constitute the "principal purpose" of an acquisition within the intendment of section 269, such purpose must outrank or exceed any other single purpose. S. Rept. No. 627, 78th Cong., 1st Sess. (1943), 1944 C.B. 1017; Canaveral International Corp. v. Commissioner,61 T.C. 520, 536 (1974). Moreover, the determination of a principal purpose requires an examination of all of the facts and circumstances in which the acquisition occurred. Although, in theory, the question of purpose is subjective, "pragmatically, * * * the trier of fact can only determine purpose from objective facts." Bobsee Corp. v. United States,411 F.2d 231, 238 (5th Cir. 1969). *476 Finally, the purpose which is relevant is the purpose which existed at the time of acquisition, although facts occurring prior to and following the acquisition may be considered to the extent that they tend to support or negate the forbidden purpose. Hawaiian Trust Co., Ltd. v. United States,291 F.2d 761, 768 (9th Cir. 1961). Petitioner bears the burden of proving that the prohibited purpose was not the primary motivation for its acquisition. Rule 142(a). The above rules must be applied in light of the overall goal of the enactment of section 269, which, as expressed by Congress, was: * * * to codify and emphasize the general principle set forth in Higgins v. Smith (308 U.S. 473 * * *), and in other judicial decisions, as to the ineffectiveness of arrangements distorting or perverting deductions, credits, or allowances so that they no longer bear a reasonable business relationship to the interests or enterprises which produced them and for the benefit of which they were provided. S. Rept. No. 627, 1944 C.B. at 1016. It is respondent's basic position in this case that Inductotherm's acquisition of New Trident's stock was primarily motivated by its desire to secure, for its own use, *477 the benefit of New Trident's net operating losses and other unused tax benefits. In support of this position, respondent points to New Trident's history of financial failure prior to the acquisition by Inductotherm of New Trident's stock, as well as the failure of Inductotherm to conduct anything but a cursory examination of the financial background of New Trident's business, a business with respect to which Inductotherm and its officers were unfamiliar, prior to the acquisition. These confirmed facts, respondent argues, lead to an inference that tax considerations, rather than any legitimate interest in operating New Trident on a profitmaking basis, prompted the stock acquisition. Respondent also maintains that it is apparent on this record that, by the time Inductotherm entered into negotiations to purchase New Trident's stock, it was fully aware of the existence of New Trident's unused net operating losses and other unused tax benefits, and that no business purpose other than to secure these future tax attributes has been demonstrated as justifying the stock purchase. Accordingly, respondent contends that tax motivations must have predominated in the decision to acquire New Trident's *478 stock. Petitioner contends that Inductotherm's sole purpose in acquiring New Trident's stock was the prospect of making business profits through New Trident's operations. In support of this contention, petitioner first points to its history of growth through acquisition and argues that the acquisition of New Trident was consistent with this general corporate policy. Second, petitioner contends that the record demonstrates that Inductotherm was unaware of the tax attributes of New Trident at the time of acquisition and argues that, under such circumstances, it could not have been motivated to acquire such company by tax avoidence. Third, petitioner contends that it has demonstrated a legitimate nontax business reason for the purchase of New Trident's stock rather than its assets. Finally, petitioner argues that the extent of its efforts, and Inductotherm's efforts to make a success of New Trident's business subsequent to its acquisition and prior to its liquidation demonstrates that the purchase itself was not tax motivated. As a starting point, as stated above, we are here concerned with the principal purpose in acquiring New Trident's stock at the time the transaction was closed. *479 Although respondent contends on brief that the purchase of New Trident's stock by Inductotherm was not closed until June 18, 1973, [42] such contention is without merit. It is true, as respondent points out, that the transfer of ownership for Federal tax purposes occurs upon a passing of sufficient beneficial ownership, rather than on meeting the technical requirements of State law for the passage of legal title. Yelencsics v. Commissioner,74 T.C. 1513, 1527 (1980) and the cases cited therein. However, it is clear in this case that Waltham's entire interest in New Trident's stock was conveyed to Inductotherm on June 30, 1972. No contingency was placed on this sale. In fact, Waltham's trustee in bankruptcy specifically rejected attempts to make the sale contingent upon New Trident's successful Chapter XI reorganization. Moreover, the price to be paid to Waltham for the stock was definitely fixed and totally paid by June 30, 1972. The stock was paid for on that date and the stock purchase agreement utilized the descriptive terms "buyer" and "seller." Cf. Clodfelter v. Commissioner,48 T.C. 694, 701 (1967), affd. 426 F.2d 1391 (9th Cir. 1970). Absent evidence to the contrary, *480 the date of completion of delivery and payment for New Trident's stock must be considered the event which transferred ownership thereof. As stated by the Ninth Circuit Court of Appeals in Hertz Drivurself Stations, Inc. v. Ritter,91 F.2d 539, 541 (9th Cir. 1937): [When] there is nothing in the agreement of the parties to the contrary, the intent ordinarily is that a contract for the sale of stock is performed, and title to the shares of stock transferred upon delivery of the stock. The date of Inductotherm's acquisition of New Trident's stock was thus June 30, 1972, and we must determine whether the prohibited purpose contemplated by section 269 was present on that date. We think that the evidence in this case, when considered in light of the principles set out above, requires a holding that section 269 applies to Inductotherm's acquisition of New Trident's stock. Petitioner has failed to prove that its predecessor's principal purpose in acquiring the stock was not to avoid taxes by preserving, for its own benefit, New Trident's net operating *481 loss carryovers and other unused tax benefits, either for purposes of offsetting such losses and benefits against future income produced by the operation of the business of New Trident under its control, or, in the event the business did not succeed within a relatively short period, by liquidating New Trident into itself and using the loss carryovers and other tax benefits to offset its own income. In either case, the stock acquisition was primarily motivated by the desire to secure the benefit of the loss carryovers and other tax benefits which would not have been otherwise available to it within the intendment of section 269. See and compare Commissioner v. British Motor Car Distributors, Ltd.,278 F.2d 392 (9th Cir. 1960), revg. 31 T.C. 437 (1958); Thomas E. Snyder Sons Co. v. Commissioner,288 F.2d 36 (7th Cir. 1961), affg. 34 T.C. 400 (1960), cert. denied, 368 U.S. 823 (1961); Industrial Suppliers, Inc. v. Commissioner,50 T.C. 635 (1968); H.F. Ramsey Co., Inc. v. Commissioner,43 T.C. 500, 517 (1965). We do not doubt that Inductotherm's initial interest in New Trident's business was generated by a bona fide (albeit uninformed and excessively optimistic) belief that such business *482 could be made a profitable enterprise under its control. Although Inductotherm's general unfamiliarity with the nature of New Trident's business at the time initial negotiations began for the purchase of its assets in early 1972, combined with its failure to conduct anything but a cursory examination of the prospects of that business prior to agreeing to become associated with the business, tend to suggest that Federal tax rather than business considerations precipitated its decision to form such a relationship, other facts of record convince us that this was not, at least initially, the case here. The structure of the relationship between Inductotherm and the business of New Trident, as originally proposed and agreed upon, makes it clear that initially, tax considerations did not predominate. The parties originally intended that the business of New Trident would be reestablished under a new name, in a new corporation, under the control of Industotherm. It was agreed that Bardwell, with the financial assistance of Inductotherm, would purchase the technical assets of New Trident for cash, and that these technical assets would then be contributed to the newly established corporation *483 for its use. If this structure had ultimately been followed, the net operating losses and other unused tax benefits of New Trident would not have carried over to the newly established corporation and would therefore never have been available to petitioner or its predecessor. Section 381. Federal tax considerations could not have motivated Inductotherm to agree to this relationship from the outset. We will therefore assume that Inductotherm's original desire to acquire the technical assets (i.e. patents) of New Trident was motivated by a valid business purpose. However, the fact that Inductotherm would have acquired New Trident's technical assets in the absence of a tax avoidance motive does not end the inquiry. Rather, the determinative question under section 269 is whether the principal purpose of the acquisition of controlofacorporation was tax avoidance, not whether there was an absence of a business purpose in acquiring a corporation's assets. Section 1.269-3(a), Income Tax Regs. See also F.C. Publication Liquidating Corp. v. Commissioner,304 F.2d 779, 780-781 (2d Cir. 1962), affg. 36 T.C. 836 (1961); Canaveral International Corp. v. Commissioner,supra at 539; Industrial Suppliers, Inc. v. Commissioner,supra at 646. *484 The fact that Inductotherm intended to use New Trident's technical assets for business reasons does not, in and of itself, explain the principal purpose of the stock acquisition. This point was made clear in Industrial Suppliers, Inc. v.Commissioner,supra. In that case, Caldwell and associates acquired for $20,000 the stock of a corporation which had inventory with a book value of $165,475 and a history of net operating losses. Subsequent to the purchase, the losses of the corporation were used to offset gains of a profitable joint venture. The taxpayer argued that the purchaser's principal purpose in purchasing the stock of Caldwell and associates was to acquire the corporation's inventory at a bargain price. Rejecting this argument, this Court stated ( Industrial Suppliers, Inc. v. Commissioner,50 T.C. at 646): We have no doubt that Caldwell was interested in acquiring petitioner's inventory at what he considered to be a bargain price and, on first impression, this would appear to be a valid, business purpose for the acquisition of petitioner's stock. We are not convinced, however, that the tax benefits to be derived from the carryover of previous net operating losses were *485 not the principal purpose for acquiring the inventory through the purchase of petitioner's stock rather than by a simple purchase of the inventory itself. The purchase of the stock and the various manipulations which this involved, as well as the subsequent utilization of petitioner in the * * * [joint] venture, thereby creating additional profits against which the loss carryovers could be applied, belie Caldwell's testimony that the tax benefits were not a consideration for the purchase of the stock. [Emphasis in original.] Cf. Bobsee Corp. v. United States,supra at 239. This is not to suggest that section 269 will apply to every stock acquisition merely because such a transaction produces more favorable tax results than an asset acquisition otherwise would. However, when section 269 is placed in issue, the taxpayer must demonstrate that his selection of that method of acquisition was primarily motivated by genuine, nontax related, business reasons. After a careful review of the entire circumstances surrounding Inductotherm's purchase of New Trident's stock in June 1972, we must conclude that petitioner has failed to demonstrate any legitimate nontax business reason for the *486 stock purchase. Inductotherm's willingness to structure the acquisition in this manner, with all of its attendant complications, in the absence of such a demonstrated business reason, leads to a necessary inference in this case that tax considerations predominated.Cf. Thomas E. Snyder Sons Co. v. Commissioner,288 F.2d at 39. Initially, it is quite clear on this record that the only assets of New Trident that Inductotherm wanted or needed to acquire for purposes of operating its business as a subsidiary were New Trident's technical assets (i.e. its patents). The agreement of February 28, 1972, among Bardwell, Stone and Inductotherm makes this clear. Moreover, Inductotherm's negotiations with the coassigness of New Trident's assets during February and March 1972, focused exclusively on New Trident's technical assets. Finally, when Old Trident Tool was formed in March 1972, and subsequently conducted the business of New Trident, the only assets of New Trident's business that were assigned to it by way of a licensing agreement were New Trident's patents. Accordingly, petitioner can make no argument that the purchase of New Trident's stock was necessary for purposes of acquiring assets *487 of New Trident other than these patents. The evidence is unmistakably clear that Inductotherm altered its originally proposed method of acquisition of New Trident's assets, to one of stock purchase, after it had hired Gross, an attorney, to assist it in the asset acquisition, and that this shift was made at the specific suggestion of Gross. Additionally, there is every indication in this record that Gross had at least a general awareness of New Trident's loss position at the time he suggested that the transaction be cast in the form of an acquisition of New Trident's stock, rather than an asset acquisition. It is extremely unlikely that Gross would not have communicated this awareness to Inductotherm's officers when he suggested the stock acquisition, especially since the proposed stock purchase involved complications (discussed infra) which would not have been present if the simpler asset acquisition route had been pursued. Moreover, conspicuously absent in this case was testimony of Gross himself. Petitioner did not call Gross as a witness herein, and its failure to do this is nowhere explained in the record. This failure to call as a witness the individual who conceived of the *488 form of the acquisition weighs heavily against petitioner in this case. Cf. Frank Spingolo Warehouse Co., Inc. v. Commossioner,37 T.C. 1, 6 (1961); Thomas E. Snyder Sons Co. v. Commissioner,288 F.2d at 39. While Hotchkin testified that he had no knowledge of operating loss carryovers at the time he, on behalf of Inductotherm, decided to cast the transaction in the form of a stock purchase, his self-serving, unsupported testimony is unconvincing in light of the foregoing, as well as other evidence of record. Hotchkin was a certified public accountant and in charge of acquisition work for Inductotherm. Moreover, shortly after the stock purchase, in a letter to Waltham's trustee, Hotchkin stated that: * * * In this connection we should like to determine the tax position of Trident as it is contained in the consolidation of Waltham Industries. In other words, we have a distinct understanding that the losses of Waltham were sizeable and they did not have to avail themselves of the loss to Trident. * * * Although petitioner attempts to rely upon this communication in support of its contention that Inductotherm did not have knowledge of New Trident's tax position prior to the acquisition *489 and that, therefore, it could not have been motivated by tax considerations in the stock acquisition, such reliance is unwarranted. It is immaterial whether Inductotherm was afforded an opportunity to examine Waltham's books prior to the acquisition. It is enough for purposes of section 269 that Inductotherm had a "distinct understanding" that New Trident had sizeable unused net operating losses and other unused tax benefits at the time of the acquisition, if such "understanding" predominated in its decision to purchase the stock. See R.P. Collins & Co. v. United States,303 F.2d 142, 146 (1st Cir. 1962); Fawn Fashions, Inc. v. Commissioner,41 T.C. 205, 212-213 (1963). On this record we conclude that Inductotherm was, for purposes of section 269, sufficiently informed of New Trident's tax benefits prior to the acquisition. We are convinced that Inductotherm's awareness of New Trident's losses and other unused tax benefits primarily motivated the stock acquisition. No other convincing reason appears on this record as to why it did not simply purchase the technical assets of New Trident from the coassignees (or the coassignees and Waltham's trustee), rather than implementing the "tortuous" *490 (see Fawn Fashions, Inc. v. Commissioner,supra at 212) procedure of purchasing New Trident's stock. The fact that New Trident's assets were in the hands of assignees for the benefit of its creditors normally would have dictated that only the corporation's assets be acquired, rather than the purchase of the effectively bankrupt corporation itself, with all of the attendent risks of disclosed and undisclosed liabilities.Cf. Canaveral International Corp. v. Commissioner,supra at 538. Moreover, such an asset purchase would have rendered unnecessary Inductotherm's participation in New Trident's subsequent Chapter XI reorganization, the partial discharge in bankruptcy of New Trident almost one year after the acquisition, the requirement that Inductotherm provide funds to New Trident pursuant to the bankruptcy order, and the merger of Old Trident, the theretofore operating company, into New Trident.Absent a satisfactory nontax explanation for this convoluted series of steps, which were made necessary only because Inductotherm opted to purchase New Trident's stock rather than its patents, the inference is irresistible that tax motivations controlled the acquisition. Fawn Fashions, Inc. v. Commissioner,supra at 212-213; *491 H.F. Ramsey Co., Inc. v. Commissioner,supra at 519; Canaveral International Corp. v. Commissioner,supra at 538. Petitioner argues that the stock purchase and the various manipulations which such purchase entailed, were necessitated by Inductotherm's inability to purchase the patents from the coassignees. However, such a contention is unsupported by the record in this case. It is true that Inductotherm's initial attempt to purchase the assets from the coassignees was thwarted by the creditors of New Trident who, in February of 1972, attemped to place New Trident in Federal bankruptcy. However, Inductotherm hired Gross to secure a dismissal of this Federal proceeding, and in mid-March 1972, as the result of the efforts of Gross, the Federal bankruptcy proceeding was dismissed. This had the effect of placing New Trident's assets in the hands of the coassignees. The coassignees were not called as witnesses in this case and no evidence has been otherwise presented which would tend to suggest that the coassignees would have been unwilling to sell their interest in the technical assets of New Trident after mid-March 1972, or that confirmation of such a sale would be unsuccessful in the *492 State proceeding. To the contrary, the fact that the coassignees would have willingly participated in such a transaction is evidenced by their previous agreement to convey the patents to Bardwell in February 1972. Petitioner continues to complain, however, that the purchase of these assets from the coassignees of New Trident would have been difficult because the assets were in the hands of coassignees in a New Jersey State proceeding, and such purchase would therefore have to have been confirmed by the State Court. This point provides petitioner with no support. Waltham, the owner of New Trident's shares, was, at the time of the stock purchase, in Federal bankruptcy proceedings, and its assets, including New Trident's stock, were in the hands of Waltham's trustee. In fact, such stock was pledged to Waltham's creditors. Thus, judicial confirmation was required for the purchase of the stock, just as it would have been required for the purchase of the assets. The record does indicate that, during March 1972, Inductotherm's representatives developed some concern that title to the patents used in New Trident's business might not rest with the coassignees because Waltham might never *493 have transferred such patents to New Trident. Apparently, Inductotherm continued to harbor these doubts at the time of the stock acquisition since, pursuant to the stock transfer agreement, Waltham, in addition to transferring the stock, conveyed all of its right, title and interest in these patents. Although petitioner has not raised the point on brief, it could conceivably be argued that the stock acquisition, combined with Waltham's conveyance of any right it might possess in the patents used in New Trident business, was the most feasible means by which Inductotherm could secure undisputed title to the patents. Despite petitioner's failure to rely on this argument, we have considered it, and find that it is unsupported by the record. Waltham's trustee was not called to testify in this case, and no evidence has been otherwise presented that would tend to prove that Waltham would not have been willing either to formally assign any interest in the patents it might possess to the coassignees prior to Inductotherm's purchase of the assets from the coassignees. Nor is there any evidence in this record which would support a conclusion that Waltham's trustee would have been unwilling to *494 convey its interest in the patents without, in addition, transferring New Trident's stock. It is apparent from the plan of arrangement which Waltham filed with the Federal District Court in California on May 23, 1972, that Waltham's trustee did not make a serious claim to the patents. As stated in the plan: So far as can be determined, WALTHAM transferred all of its right, title and interest in and to the patents * * * to [New Trident when it was formed]. Although this might not have been recorded in the Patent Office, nevertheless, the Trustee believes that * * * the transfer of patent rights [should be made] in accordance with this offer. Under these circumstances, we are unable to assume that Waltham's trustee would have been unwilling to undertake what would, in his view, have been a mere formality by either assigning his rights to the patents to New Trident, or, in the alternative, conveying such interest to Inductotherm without requiring the stock purchase. Petitioner has not established that either of these simpler routes was unavailable. Petitioner finally urges that the operation of Old Trident Tool and, subsequently, New Trident, buttresses its contention that the acquisition *495 here concerned was not motivated by tax avoidance within the intendment of section 269. However, as already discussed supra, the presence of a business motive in seeking New Trident's assets does not alone explain the principal purpose for the stock acquisition. To establish a principal nontax motive in this case, petitioner had to justify Inductotherm's decision to expose itself to all of the complications and liabilities which the stock purchase entailed. Cf. Bobsee Corp. v. United States,supra at 239. This petitioner has failed to do. In this case, Inductotherm paid $14,000 for the purchase of New Trident's stock at a time when New Trident's assets were in the hands of assignees for the benefit of creditors. At this time, New Trident's records apparently reflected net operating loss carryovers of $124,902 for 1969, $310,408 for 1970 and $321,243.91 for 1971. It is thus apparent, as it must have been apparent to Inductotherm, that if New Trident could be operated at a profit, or liquidated before the carryover period expired, any additional financial risk which the stock purchase entailed would be more than offset by the ultimate use of these and other unused tax losses. *496 Absent a demonstrated nontax purpose for the stock purchase, it is therefore only reasonable to conclude that the existence of these net operating and other unused losses prompted Inductotherm to structure the acquisition in the manner they did, and we so hold. [43] Moreover, petitioner, as successor to Inductotherm, occupies the same position. (2) Operation
Having concluded that Inductotherm acquired New Trident's stock primarily for tax avoidance purposes within the meaning of section 269, we must now determine the tax consequences of that determination. Respondent contends that section 269 should operate in this case to disallow all of the net operating losses *497 at issue herein. Petitioner has not addressed this contention on brief or otherwise. We cannot agree with respondent that section 269 operates in this case to disallow all of the loss carryovers claimed by petitioner on its fiscal 1975 return. Section 269 clearly has no application to the losses generated by Old Trident Tool during its short year beginning March 1, 1972, and ending October 31, 1972. Old Trident Tool was not acquired by Inductotherm in any transaction to which section 269 applies. Old Trident Tool was created by Inductotherm prior to its decision to pursue the acquisition of New Trident's stock, and pursuant to its original plan to acquire New Trident's assets and operate New Trident's business in this newly created corporation. As discussed supra, this structure by its very nature could not have been motivated by tax considerations. Therefore section 269 cannot apply to Inductotherm's creation of Old Trident. Moreover, Old Trident Tool's subsequent merger into New Trident is simply not a transaction covered by section 269. Inductotherm did not "acquire control" of Old Trident Tool by virtue of the merger within the intendment of section 269(a)(1). Such control *498 already existed. Nor does section 269(a)(2) apply to the merger. That section, by its specific terms, does not apply to asset transfers of this type between commonly controlled corporations. Thus, section 269(a)(2) states that it applies only if any corporation acquires * * *, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders * * *. [Emphasis supplied.] Since Old Trident Tool was controlled by Inductotherm, which was also New Trident's shareholder, immediately before the merger of Old Trident Tool into New Trident, section 269 is inapplicable to such merger. Accordingly, the losses generated by Old Trident Tool prior to the merger (i.e. $34,979.42) are unaffected by section 269. [44] *499 More importantly, although petitioner has not raised the point, a problem is present as to whether all loss carryovers generated by New Trident itself should be disallowed under section 269, as contended by respondent. These loss carryovers were claimed in petitioner's fiscal 1975 return in the following amounts, from the following years of New Trident: Year
Amount
1970
$310,408.00
1971
321,243.96
1972
267,617.61
1973
69,963.38
1974
184,297.44
Less "adjustment
1,153,530.39
for forgiveness of
Indebtedness"
71,280.41
$1,082,249.98
It is clear that section 269, subject to respondent's discretion, (see section 269(b)), is applicable to disallow the use by petitioner of New Trident's loss carryovers which occurred prior to Inductotherm's acquisition of that company, since such losses would not have been available to petitioner absent the stock acquisition. However, the Third Circuit Court of Appeals has held that section 269 does not apply to *500 disallow post-affiliation losses if the claiming of such losses does not result in unjust enrichment to the taxpayer, i.e. to the extent that such losses accrued economically after the prohibited section 269 transaction. See Herculite Protective Fabrics Corp. v. Commissioner,387 F.2d 475, 476 (3d Cir. 1968), vacating and remanding a Memorandum Opinion of this Court. But see Hall Paving Co. v. United States,471 F.2d 261 (5th Cir. 1973); Borge v. Commissioner,405 F.2d 673, 678-679 (2d Cir. 1968), cert. denied sub nom. Danica Enterprises, Inc. v. Commissioner,395 U.S. 933 (1969); Temple Square Mfg. Co. v. Commissioner,36 T.C. 88, 95 (1961). Since an appeal in this case would lie with the Third Circuit Court of Appeals, we are bound to follow the pronouncements of that Circuit in resolving this issue. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied, 404 U.S. 940 (1971). Accordingly, we must determine which of the above-claimed losses accrued to New Trident, in economic terms, prior to Industotherm's acquisition of that company. Initially, it is clear that the losses allegedly incurred by New Trident in 1970 and 1971 were economically *501 sustained by New Trident prior to Inductotherm's acquisition of New Trident's stock on June 30, 1972. Accordingly, such losses will be disallowed pursuant to the provisions of section 269. With respect to the losses reported on New Trident's 1972, 1973 and 1974 Federal income tax returns, respondent basically contends that all such losses are attributed to deductions and allowances which accrued economically prior to the acquisition, and argues that, as such, they constituted "built-in" losses which would not have been available absent the stock acquisition. Accordingly, respondent maintains that the losses claimed on New Trident's 1972, 1973 and 1974 returns should be disallowed to petitioner in their entirety. Respondent's contentions have some merit, but they are overly broad in their proposed application and their asserted result. It is true, ad indicated above, that losses which, in economic terms, accrued to New Trident prior to its acquisition and which were not otherwise sustained by petitioner or Inductotherm, may not, under section 269, form the basis of post-acquisition deductions and allowances. However, application of this rule to the facts of this case does not completely *502 erase all of the losses claimed by New Trident subsequent to the acquisition date. The question is to what extent deductions and allowances claimed by New Trident after the acquisition already had accrued economically prior to the acquisition and were therefore not borne by New Trident under Inductotherm or petitioner's control. Only to that extent will such post-acquisition deductions and allowances be subject to disallowance under section 269 in this case. Herculite Protective Fabrics Corp. v. Commissioner,supra; cf. Canaveral International Corp. v. Commissioner,supra.
As indicated above, New Trident reported a total net operating loss of $267,617.61 on its 1972 Federal income tax return. In computing this loss, New Trident offset against gross receipts of $45,166, a cost of goods sold allowance of $139,245.14. Additionally, New Trident claimed, inter alia, an amortization deduction of $51,924.98 and a deduction of $97,699.19 for "loss value of assets." Respondent contends that these claimed deductions and allowances, in their entirety, constituted "built-in" losses which accrued economically to New Trident prior to the acquisition of New Trident's stock by Inductotherm, *503 and maintains that such deductions and allowances therefore should be disallowed under section 269. We agree with respondent that these claimed allowances and deductions for 1972, as well as those claimed by New Trident for 1973 and 1974, must be disallowed under section 269 to the extent that they are attributable to preacquisition declines in the value of the assets that generated such deductions and allowances. In determining the extent to which claimed post-acquisition deductions and allowances are attributable to preacquisition declines in value of the assets which generated such deductions and allowances, we would ordinarily assume that the difference between the basis of new Trident's assets, as carried on its books at the time of the acquisition, and the asset's allocable share of the purchase price paid for New Trident's stock, constituted preacquisition economic loss which had accrued prior to the acquisition. Cf. Canaveral International Corp. v. Commissioner,supra at 540. We would then compute allowable post-acquisition deductions and allowances with respect to these assets by reference to the respective assets' allocable share of the purchase price paid for New Trident's *504 stock. [45] *505 In this manner, preacquisition losses to the value of such assets would not be allowed to support post-acquisition deductions, and such result is consistent with the underlying purpose of section 269, as well as the reasoning contained in Herculite Protective Fabrics Corp. v. Commissioner,supra.Cf. S. Rept. No. 627, 78th Cong., 1st Sess. 61 (1943), 1944 C.B. 973. Application of these concepts must be modified in certain respects in the context of this case. First, it is clear on this record that the depreciable and amortizable assets with respect to which New Trident computed its "loss value of assets" deduction on its 1972 return, were completely worthless as of the acquisition date. This deduction was computed by reference to the adjusted basis of these assets as of the beginning of the 1972 tax year. Accordingly, this deduction is attributable, in its entirety, to preacquisition losses, and will therefore be disallowed pursuant to the provisions of section 269. Moreover, no portion of the purchase price for New Trident's stock will be allocated to these assets in computing the allowable post-acquisition *506 deduction. [46]
Second, in allocating the purchase price of New Trident's stock to the basis of the other assets carried on New Trident's books as of the acquisition date, we are hampered by the parties' failure to produce a closing balance with respect to such assets as of June 30, 1972. The evidence presented in this case discloses only the book balances of New Trident's assets at the beginning and end of 1972. Such evidence discloses the following book bases: Beginning
Ending
Carryover From
Asset Account
Balance
Balance
Old Trident Tool
Cash
$ (1,717.00)
$174.00
$141.11
Accounts Receivable
33,423.00
56,006.34
15,831.48
Inventories
119,669.72 (plus
additions of $56,458.35)
36,882.93
11,318.03
Other Current Assets
2,780.00
393.10
Amortizable Assets
152,407.00 (less amorti-
zation of $51,924.98)
102.212.56
Other Assets
26,212
26,212.59
Except with respect to the inventory amounts carried over from the merger of Old Trident Tool into New Trident, nothing *507 in this record would tend to establish that any portion of the total inventory book balance (i.e. $119,669.72 + $56,458.35 = $176,128.07) was attributable to additions made to that inventory subsequent to the acquisition date. Nor can we tell from this record whether or to what extent the reduction in value resulting in the ending inventory value reflected above, resulted from sales or inventory writeoffs occurring prior to the acquisition. [47] *508 Moreover, except with respect to the amounts carried over from Old Trident Tool's merger into New Trident, nothing in the record would tend to establish that the ending balances reflected in New Trident's other asset accounts listed above were attributable to additions made to those accounts subsequent to the acquisition. These gaps in the record must weigh against petitioner in this case, in light of its burden of proof, and we will accordingly assume that when Inductotherm purchased New Trident's stock on June 30, 1972, the book bases for its assets (other than those acquired from Old Trident Tool) were as follows: Book Basis as [48]
Asset Account
of 6/30/72
Cash
$32.89
Accounts Receivable
40,174.86
Inventories
25,564.90
Other Current Assets
393.10
Amortizable Assets
128,175.07
Other Assets
26,212.59 Allocating the total purchase price paid by Inductotherm for New Trident's stock (i.e. $14,000) to *509 those assets in proportion to the relative book bases of these assets (other than cash) at the date of acquisition (see Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930)) the respective values as of the acquisition date were as follows: Asset Account
Value
Cash
$ 32.89
Accounts Receivable
2,564.36
Inventories
1,631.36
Other Current Assets
26.54
Amortizable Assets
8,071.59
Other Assets
1,673.26
Total
$14,000.00
Further applying the above assumptions, when Inductotherm purchased New Trident's stock on June 30, 1972, New Trident possessed inventory with a value of $1,631.36. When Old Trident Tool was thereafter merged into New Trident, New Trident succeeded to Old Trident Tool's inventory with a value of $11,318.03. New Trident's total post-acquisition inventory value as well as its ending inventory, for 1972 was thus $12,979.39, and we must therefore assume that no post-acquisition costs of goods sold were sustained by New Trident. New Trident's claimed cost of goods sold allowance for 1972 must therefore be disallowed in its entirety. New Trident's allowable post-acquisition amortization deduction will also be allowable only to the extent that the deduction reflects post-acquisition economic reductions *510 in the value of these assets. On the acquisition date, the value of these assets was $8,071.59. Assuming a 10-year useful life for these assets, and a 10 percent salvage value, (see section 167(f)), New Trident's allowable post-acquisition amortization deduction for the 1972 tax year is thus $363.22. The remainder of New Trident's claimed amortization deduction for 1972 (i.e. $51,561.76) must be disallowed under section 269. Thus, on this record it appears that New Trident's claimed deductions for amortization in the amount of $51,561.76, as well as its claimed deduction for "lost value of assets" of $97,669.19 and its claimed cost of goods sold allowance of $139,245.14, were attributable to declines in the value of those assets which accrued prior to Inductotherm's acquisition of New Trident's stock. This combined amount (i.e. $288,506.09) therefore represented built-in losses, acquired in a transaction to which section 269 applies, and must accordingly be disallowed. The disallowance of these deductions and allowances totally erases New Trident's claimed net operating loss from 1972, and petitioner will therefore not be entitled to any portion of the loss carryover in issue *511 to the extent it is attributable thereto. [49]
On its 1973 return, New Trident reported total net operating loss of $69,963.38, computed as follows: Gross Receipts
$173,688.47 Less: Cost of Goods Sold
(117,463.85)
Gross Profit
56,224.62 Capital Gains
246.13 Other Income
5.00 Total Income
$56,475.75 Deductions: Compensation of Officers
32,282.42 Salaries and Wages
7,839.24 Rents
4,553.00 Taxes
3,004.77 Interest
4.60 Amortization
41,812.59 Depreciation
2,922.14 Advertising
6,666.71 Other Deductions
[50] *512 27,353.66 $126,439.13 Taxable Income (Loss)
(69,963.38)
In computing the above claimed allowance for cost of goods sold, New Trident used the following inventory balances: Opening Inventory
$ 36,882.93 Additions
202,965.48 Total
239,848.41 Less: Ending Inventory
(122,384.56)
Cost of Goods Sold
$117,463.85 As discussed above, the opening inventory balance for 1973 must be reduced in computing New Trident's allowable post-acquisition losses by the amount that the book value of these assets exceeded the allocable portion of Inductotherm's purchase price for New Trident's stock. Accordingly, New Trident's cost of goods sold allowance for 1973 must be reduced by a like amount. This leaves New Trident with a post-acquisition cost of goods sold allowance of $93,529.92 computed as follows: Opening Inventory
$12,949.39 Additions
202,965.48 Total
215,914.87 Less. Ending Inventory
(122,384.56)
Cost of Goods Sold
$93,530.31 Moreover, it *513 is clear that no assets were added to New Trident's amortizable asset account during the 1973 tax year. The allowable amortization deduction for 1973 must therefore be computed by reference to the post-acquisition basis of these assets, as determined supra. This results in an allowable amortization deduction for 1973 of $726.44. Reducing New Trident's claimed cost of goods sold allowance and amortization deductions as outlined above, results in a total disallowance for 1973 under section 269 of $65,020.08. Since all other deductions claimed on New Trident's 1973 return constituted economic costs incurred by New Trident subsequent to the acquisition date, such deductions must be allowed to New Trident pursuant to the reasoning contained in Herculite Protective Fabrics Corp. v. Commissioner,supra. This leaves New Trident with a total allowable post-acquisition loss of $4,943.30 for 1973, and this amount will therefore be allowed to petitioner as a net operating loss carryover on its fiscal 1975 return. [51] *514 On its 1974 Federal income tax return for its short year ending October 31, 1974, New Trident claimed a total net operating loss of $187,297.44, computed as follows: Income: Gross Receipts
$90,498.66 Less: Cost of Goods Sold
(133,343.75)
Gross Profit (Loss)
(42,845.09)
Ordinary Loss
(5.18)
Total Income (Loss)
(42,850.27)
Deductions: Compensation of Officers
8,263.98 Salaries and Wages
11,743.04 Bad Debts
3,990.00 Rents
3,200.00 Taxes
1,478.92 Interest
25.13 Amortization
45,870.72 Depreciation
2,741.63 Advertising
2,887.83 Other Deductions
61,245.92 Total Deductions
141,447.17 Taxable Income (Loss)
(184,297.44)
The *515 above-claimed cost of goods sold allowance was computed by New Trident as follows: Opening Inventory
$122,384.56
Additions
83,283.44
Total
205.668.00
Ending Inventory
72,324.25
Cost of Goods Sold
$133,343.75
Consistent with prior assumptions, no portion of the beginning inventory was attributable to assets held by New Trident prior to the acquisition, and therefore no adjustment thereto is required. The cost of goods sold allowance therefore constitutes economic costs which were incurred by New Trident subsequent to the acquisition and must be allowed in full. Moreover, all claimed deductions other than a portion of claimed amortization, and "other deductions," above, clearly represent expenditures, or accruals for expenditures, which accrued economically subsequent to the acquisition and such deductions must also be allowed. With respect to the claimed amortization deduction of $45,870.72, it is clear that no assets were added to New Trident's amortizable asset account during the 1974 tax year. The allowable amortization deduction for 1974 must therefore be computed by reference to the post-acquisition basis for these assets, for the short year 1974, as determined supra. This results in *516 an allowable amortization deduction for 1974 of $605.37. The claimed deduction for amortization will be disallowed to the extent of the excess (i.e. $45,265.35). Finally, as a part of its claimed deductions for "other deductions," on its short year 1974 return, New Trident claimed a deduction of $42,152.07 for "loss on sale of assets in dissolution." As explained in our findings, New Trident computed this claimed loss as follows: Claimed Adjusted
Amount
Gain or
Asset
Basis
Realized
Loss
Accounts Receivable
$0
$1,629.00
$ 1,629.00 Inventory
72,324.25
54,243.19
(18,081.06)
Patents and R & D
14,529.25
0
(14,529.25)
Depreciable Assets
30,251.82
19,081.06
(11,170.76)
Total Loss:
($42,152.07) As indicated in the prior discussion herein, the claimed losses from New Trident's sale of its inventory and depreciable assets were economic losses sustained by New Trident subsequent to Inductotherm's acquisition of New Trident's stock. That is, all remaining inventory and depreciable assets on the liquidation date were added subsequent to the acquisition, and any loss in its value must have accrued subsequent thereto. Accordingly, these losses are unaffected by section 269 and will be allowed. The claimed loss from *517 the sale of New Trident's amortizable assets, however, involves different considerations; a portion of this loss had accrued to New Trident prior to the acquisition, and such preacquisition loss cannot be allowed. As explained supra, when Inductotherm purchased New Trident's stock, the value of New Trident's amortizable assets totaled $8,071.59. Subsequent to the acquisition date, no additions were made to the amortizable asset account, and we have determined that New Trident's allowable post-acquisition amortization deductions were $1,695.03. Thus, when New Trident transferred its amortizable assets to New Trident Tool in 1974 for no consideration, its remaining basis in these assets was $6,376.56, and this amount represents the total allowable loss from the transfer. Accordingly, to the extent that New Trident's claimed loss exceeds this amount (i.e. $8,152.69), it will be disallowed. It is clear that all other deductions claimed by New Trident on its 1974 return represented economic costs that were incurred by that company subsequent to the acquisition. Accordingly, New Trident's allowable post-caquisition losses for 1974, after adjustment for the disallowance of a portion *518 of its claimed amortization deduction (i.e. $45,263.35) and a portion of its claimed loss from the sale of its amortizable assets (i.e. $8,152.69), is $130,881.40, and this amount will therefore be allowed to petitioner as a net operating loss carryforward on its fiscal 1975 return. In summary, all losses claimed by New Trident which accrued to that company, in economic terms, prior to Inductotherm's acquisition of New Trident's stock, will be disallowed under section 269, but losses that were economically sustained subsequent to the acquisition will be allowed under the reasoning of the Third Circuit Court of Appeals in Herculite Protective Fabrics Corp. v. Commissioner,supra. The losses claimed on New Trident's 1970, 1971 and 1972 returns, which were carried over and claimed on petitioner's fiscal 1975 return, represented preacquisition economic losses, and will therefore be disallowed in their entirety. With respect to the net operating losses claimed on New Trident's 1973 and 1974 return, and which were carried over and claimed on petitioner's fiscal 1975 return, petitioner has established that such losses accrued economically subsequent to the acquisition only to the following *519 extent: 1973
$ 4,943.30
1974
130,881.40
Total net operating loss carryover from
New Trident allowable to petitioner
$135,824.70
In addition, petitioner will be allowed to claim the entire net operating loss generated by Old Trident Tool during its short year beginning March 1, 1972 and ending October 31, 1972 (i.e. $34,979.42). Thus, petitioner's total allowable net operating loss deduction for its fiscal 1975 year is $170.804.12. The excess claimed by petitioner on its fiscal 1975 return will be disallowed. [52] *520 To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references herein are to sections of the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all references to Rules herein are to the Tax Court Rules of Practice and Procedure, unless otherwise specifically stated.↩
2. The cable drilling procedure is the oldest well-drilling technique and basically consists of repeatedly lifting a mass of tools and dropping them to ground, causing penetration. Prior to 1962, this procedure was the predominate method used for the drilling of wells.↩
3. One type of rotary drilling which apparently was in direct competition with the cable drilling process is known as air hammer drilling. The air hammer drilling system consists of a large air compressor, a pneumatic hammer and a power driven bit. Under this system, compressed air causes the pneumatic hammer to strike the drill bit causing rapid penetration into rock. Both the air hammer system and the cable drilling system were used for drilling water wells.↩
4. Immediately after its receipt of the Waltham shares, Old Trident was liquidated and the Waltham shares were distributed to Old Trident's existing shareholders. ↩
5. It is not clear from this record whether ownership of the patents Waltham purchased from Old Trident was actually transferred to New Trident upon its formation, or whether New Trident was provided the right to use these patents by agreement.↩
6. Hotckin's duties as an employee of Inductotherm included: protection of assets; development of accounting procedures; acquisition of related business; insurance responsibility; and audit work. Hotchkin is a certified public accountant.↩
7. Inductotherm provided the entire $1,000 initial capitalization of Old Trident Tool, and received 100 percent of its stock. Apparently, no portion of this stock was ever conveyed to Bardwell or Stone.↩
8. Apparently, prospective purchasers of New Trident's assets, including Bardwell and Hotchkin, had actually gathered at the auction place on February 25, 1972, and were informed at that time of the United States District Court's order. Prospective purchasers were nevertheless allowed to view New Trident's assets at that time.
9. There is some indication on this record that this sale may have been delayed because of concerns which Hotchkin began to develop concerning whether legal title to the patents rested with the coassignees.↩
10. At that time, Gross was fully aware that New Trident's prior Federal income tax returns displayed substantial tax losses.
11. Although Inductotherm agreed to secure a release of Waltham's guarantee of New Trident's outstanding liability to Princeton Bank in the amount of $50,000 as set out in paragraph 2 of Waltham's plan of arrangement, supra,↩ this release was ultimately secured by the promise of Inductotherm to make its best efforts to satisfy the liability through collection of New Trident's receivables. Accordingly, no additional amount was ultimately paid for the stock purchase by virtue of this agreement.
12. These individuals were selected to serve as members of New Trident's board only temporarily. At New Trident's next annual meeting, Hotchkin, Rowan, Bardwell and, one J. Hoffman were installed as permanent members of New Trident's board.↩
13. It is not clear from this record whether Inductotherm assigned its interest in the patents and trademarks, which it purchased from Waltham, to New Trident. However, the licensing agreement represents that New Trident is the sole owner of all right, title and interest in the patents and trademarks. Accordingly, Inductotherm must have dropped its interest in the patents down to New Trident after it acquired ownership thereof.
14. This deduction was comprised of expenditures or accruals for expenses incurred for shipping supplies, small tools, office supplies, legal services, organizational costs, insurance, building maintenance, telephone, travel, dues, design expense, discounts, royalties and miscellaneous.↩
15. It is not described in this record whether these reported gross receipts were accrued by New Trident prior or subsequent to the acquisition by Inductotherm of New Trident's stock. 16. It is not disclosed in this record whether any portion of these claimed deductions represented expenditures or accruals for expenses which were incurred by New Trident subsequent to Inductotherm's acquisition of New Trident's stock.↩
17. It is not disclosed in this record whether any portion of these claimed deductions represented expenditures or accruals for expenses which were incurred by New Trident subsequent to Inductotherm's acquisition of New Trident's stock. ↩
18. This claimed deduction resulted from writing off the entire remaining basis in depreciable assets which was carried on New Trident's books at the beginning of 1972 (i.e. $95,829), and the remaining basis for certain amortizable assets (i.e. $1,870.00). See New Trident's 1972 balance sheet, infra.↩
19. It will be recalled that on February 28, 1972, Bardwell, Stone, and Inductotherm entered into an agreement whereby Bardwell and Stone would receive 20 and 5 percent, respectively, of Old Trident Tool's stock in part consideration for their services. However, since Inductotherm ultimately acquired New Trident's business by the above-described stock acquisition, the agreement was apparently treated by the parties as without effect. Until mid-1973, no stock of Old Trident or New Trident was ever transfereed to Bardwell or Stone.↩
20. So stipulated by the parties. By this time, petitioner had apparently succeeded to ownership of the New Trident stock, through the reorganization first described in our findings herein.
21. New Trident Tool ultimately paid only about $50,000 on this note.
22. The remainder of the "other deductions," category was comprised of claimed deductions for operating supplies, administrative services, office supplies, legal services, insurance, telephone, dues, discounts and miscellaneous.↩
23. It was not unusual for Inductotherm to provide its subsidiaries with necessary short-term operating funds by way of loans. It often borrowed funds directly from banks and other lending institutions and loaned such funds to its subsidiaries as the need arose.↩
24. The composition of this asset balance is detailed supra.↩
25. According to New Trident's books, this total amount was comprised of accounts payable of $224,348.05 which were incurred by New Trident prior to Inductotherm's acquisition of New Trident's stock, accounts payable of $1,245.54 which were incurred by New Trident subsequent to the acquisition, and intercompany payables of $74,510.52. It is not clearly disclosed whether these latter intercompany payables arose prior to the acquisition, but apparently at least a substantial portion of such did since the opening 1972 accounts payable balance displayed on this balance sheet was $295,385. 26. According to New Trident's books, this total amount was comprised of notes payable to Princeton Bank ($50,000) and Bucyrus Erie ($4,956.11). Both of these liabilities were incurred by New Trident prior to the acquisition by Inductotherm of New Trident's stock. ↩
27. This total liability was comprised of accruals for Federal and State taxes, royalty expenses, travel expenses, insurance expenses and miscellaneous expenses. ↩
28. According to New Trident's books, this total liability was comprised of the $570,243.30 liability which New Trident owed Waltham and which was assigned to Inductotherm when it purchased New Trident's stock, the total of $104,328.67 which Inductotherm had advanced to Old Trident Tool and New Trident during 1972, and intercompany payables of $23,899.42.↩
29. This $65,000 was, according to petitioner's account number 766, comprised of the $10,000 Inductotherm paid for the purchase of New Trident's stock, plus $55,000 which apparently represents Bardwell's claim against Waltham which was released by Bardwell when Inductotherm purchased the New Trident stock. This $55,000 was subsequently journalized out on petitioner's account number 766, without explanation. ↩
30. This $172,435 represents the sum of $80,328.67 which was advanced by Inductotherm to Old Trident Tool, plus the $92,106.35 which was advanced by Inductotherm and petitioner to New Trident through April 25, 1973, as hereinabove described.↩
31. The composition of New Trident's asset account for 1973 is detailed supra.↩
32. As applicable during the years in issue, sec. 381 provided in relevant part: (a) General Rule.--In the case of the acquisition of assets of a corporation by another corporation-- (1) in a distribution to such other corporation to which section 332 (relating to liquidations of subsidiaries) applies, except in a case in which the basis of the assets distributed is determined under section 334(b)(2); or (2) in a transfer to which section 361 (relating to nonrecognition of gain or loss to corporations) applies, but only if the transfer is in connection with a reorganization described in subparagraph (A), (C), (D) (but only if the requirements of subparagraph (A) and (B) of section 354(b)(1) are met), or (F) of section 368(a)(1), the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c). * * * (c) Items of the Distributor or Transferor Corporation.--The items referred to in subsection (a) are: (1) Net operating loss carryovers.--The net operating loss carryovers determined under section 172 * * *. ↩
33. As applicable during the years in issue, sec. 332 provided in relevant part as follows: (b) Liquidations to which Section Applies.--For purposes of subsection (a), a distribution shall be considered to be in complete liquidation only if-- (1) the corporation receiving such property was, on the date of the adoption of the plan of liquidataion, and has continued to be at all times auntil the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends); and * * * (2) the distribution is by such other corporation in complete cancellation or redemption of all its stock, and the transfer of all the property occurs within the taxable year; * * *.↩
34. See also Rev. Rul. 68-359, 1968-2 C.B. 161↩.
35. As indicated in our findings, New Trident held assets with a total book value of $97,261 on the liquidation date. These assets were cash ($953.95), accounts receivable ($22,982.80) and a note from New Trident Tool ($73,324.25). Respondent does not contend that the fair market value of any of the above assets, other than the note from New Trident Tool, was less than the value reflected on New Trident's books. Accordingly, since New Trident's total outstanding liability other than advances made by petitioner to New Trident, as of the liquidation date, was only $16,205.78, the fair market value of its assets would have exceeded its liabilities at that time unless advances made by petitioner are characterized as debt. This would be true irrespective of the fair market value of the New Trident Tool note.↩
36. For a discussion of this problem see Plumb, "The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal," 26 Tax L. Rev. 369↩ (1971).
37. An appeal in this case would lie with the Third Circuit.↩
38. Respondent also seems to argue that petitioner should be somehow precluded from contesting the character of the advances at issue herein because of the position it took in New Trident's Chapter XI reorganization with respect to the $570,243.30 that Waltham advanced to New Trident prior to the acquisition by Inductotherm of New Trident's stock. It will be recalled that Waltham's rights against Trident with respect to these outstanding advances were assigned to Inductotherm when it purchased New Trident's stock. Inductotherm contended in New Trident's Chapter XI proceedings that this was a true liability, rather than capital, so that it could be entitled to vote as an unsecured creditor with respect to the Chapter XI plan, and the Court in that proceeding so found. However, no portion of this $570,243.30 is at issue in this case, and these funds were advanced to New Trident during different years by a different entity. Accordingly, petitioner's position with respect to these amounts in New Trident's Chapter XI proceedings, does not, in any manner, control the characterization of amounts at issue in the present case. ↩
39. As stated in the agreement of June 23, 1973, pursuant to which the shares were transferred to New Trident, Bardwell and Stone: At the time of this writing * * * [New Trident] has not been profitable and has continuously called for additional advances from Industotherm Corp.↩
40. Because of the way we resolve this issue, we need not consider petitioner's alternative argument that, if the advances to Old Trident Tool and New Trident constituted true debts, petitioner would be entitled to claim $225,226.32 as a deduction for bad debt under sec. 166(a)(1). Since we find that the advances did not constitute true debt, but rather constituted contributions to capital, sec. 166(a)(1) is simply inapplicable.See sec. 1.166-1(c), Income Tax Regs.; United States v. Matter of Uneco, Inc.,532 F.2d 1204 (8th Cir. 1976). Moreover, our resolution of this same issue effectively disposes of petitioner's other alternative contention regarding its entitlement to a worthless stock deduction under sec. 165(g)(3). Since the value of New Trident's assets exceeded its liabilities on the liquidation date, its stock was not wholly worthless as required for application of sec. 165(g). See sec. 1.165-4(a), Income Tax Regs.↩
41. Sec. 269(a) provided: (a) In General.--If-- (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.
42. This is the date when the District Court in New Jersey approved the reference's confirmation of New Trident's Chapter XI plan of arrangement.↩
43. We note that respondent has not raised any contentions regarding the application of sec. 382(a)(1)(C) to the facts of this case. In light of our conclusion that sec. 269 is applicable herein, and since respondent has not asserted sec. 382(a)(1)(C), we do not consider the potential applicability of sec. 382(a)(1)(C) to the facts of this case. See, however, sec. 1.382(a)-1(h)(6), Income Tax Regs.; Fawn Fashions, Inc. v. Commissioner,41 T.C. 205 (1963). Compare H.F. Ramsey Co., Inc. v. Commissioner,43 T.C. 500↩ (1965).
44. Respondent generally contends that these losses have not been substantiated on this record. This contention is without merit. Old Trident Tool's computation of its claimed net operation loss is supported by summaries of ledger entries which were stipulated into evidence and which were in no way impeached or challenged by any evidence produced by respondent. In view of these facts, we find that the summary balances adequately substantiate Old Trident Tool's claimed loss for its year ending October 31, 1972. See Gordon v. Commissioner,268 F.2d 105, 108-109↩ (3d Cir. 1959), revg. and remanding a Memorandum Opinion of this Court.
45. That is, we would treat the purchase of the stock as though it were, in reality, a purchase of the acquired corporation's underlying assets and compute allowable post-acquisition deductions and allowances by reference to the acquiring corporation's cost basis for the assets. We note that this treatment would seem to be particularily appropriate in this case, at least with respect to New Trident's technical assets. As indicated in our findings, when Inductotherm purchased New Trident's stock, it also acquired all of Waltham's right, title and interest in New Trident's technical assets. The record in this case is ambiguous with respect to whether legal title to these technical assets rested with Waltham or New Trident on the acquisition date and, in light of petitioner's burden in this case, we would have to assume that title to such assets rested with Waltham at that time, and that, after the purchase, Inductotherm dropped these assets down into New Trident. As such, New Trident would, in any event, only be entitled to compute post-acquisition amortization deductions by reference to Inductotherm's cost basis in these assets, rather than by reference to a higher carryover basis. Our conclusions, infra,↩ are consistent with these principles.
46. All other depreciable assets remaining in New Trident's depreciable asset account at the close of its 1972 tax year were assets acquired by New Trident subsequent to the stock acquisition. Accordingly, these assets remain unaffected by the present discussion.↩
47. We assume, however, that a substantial percentage of the reduction in inventory reflected in the ending inventory balance used to compute New Trident's cost of goods sold allowance, resulted not from sales of inventory on hand at the opening of the 1972 tax year, but rather resulted from a writedown or writeoff of old or obsolete inventory. As indicated above, New Trident reported gross receipts of only $45,166 on its 1972 return. Its cost of goods sold allowance for that year was computed as follows: ↩
Opening Inventory plus Additions
$176,128.07
Ending Inventory
36,882.93
Cost of Goods Sold
$139,245.14
48. We assume that, except with respect to amounts carried over from Old Trident Tool's merger into New Trident, the book bases of the above assets remained constant from the period June 30, 1972, through December 31, 1972, nothing in the record appearing to the contrary.We have also increased the ending basis reflected for New Trident's amortizable assets by one-half of the depreciation deduction claimed on New Trident's 1972 Federal income tax return (representing the last six months of 1972).↩
49. Respondent generally complains that New Trident failed to make proper adjustments to the bases of its assets to reflect discharge of indebtedness which accrued pursuant to its Chapter XI plan. Respondent is correct in his contention that the cancellation or reduction of indebtedness pursuant to a Federal bankruptcy proceeding requires certain basis adjustments. See sec. 1.1016-7, Income Tax Regs. However, these rules do not require adjustments to basis below fair market value. See sec. 1.1016-7(a)(1)-(5), Income Tax Regs. Since, pursuant to our analysis, supra,↩ New Trident will be allowed to claim deductions and allowances only to the extent of their fair market value on the acquisition date, New Trident's failure to make proper basis adjustments has been fully rectified herein.
50. As indicated in our findings, the total deductions claimed as "other deductions" were shown to comprise expenditures and accruals for the following: Freight, shipping supplies, building maintenance, office supplies, legal services, insurance, telephone, travel, dues and subscriptions, discounts, research and development and sundry.
51. It will be recalled that, during 1973, Inductotherm or petitioner forgave New Trident the portion of the $570.243 debt which had been assigned to Inductotherm by Waltham, and which had not been discharged pursuant to New Trident's Chapter XI plan of arrangement (i.e. $71,280.41). It will also be recalled that New Trident "adjusted" its claimed net operating losses from prior years by this amount. This treatment was improper. The cancellation of indebtedness of a corporation by a shareholder is generally to be treated by the corporation as a contribution to capital of the corporation to the extent of the principal amount of the debt. Sec. 1.61-12, Income Tax Regs. Moreover, contributions to capital of a corporation are excluded from gross income of the corporation. Sec. 118; sec. 1.118-1, Income Tax Regs.Accordingly↩, no adjustment to New Trident's taxable income for 1973 is required as a result of this forgiveness of indebtedness.
52. Respondent raises the contention that even if any of the claimed losses are not disallowed under sec. 269, such losses should nevertheless be disallowed in their entirety for petitioner's failure to substantiate them. We disagree. We have allowed petitioner the benefit of New Trident's claimed losses which derived from claimed allowances and deductions for cost of goods sold, depreciation, amortization and losses from the sale of assets, only to the extent that the record establishes that such claimed losses accrued economically subsequent to Inductotherm's acquisition of New Trident's stock. Moreover, New Trident's claimed deductions on its 1973 and 1974 return for compensation, salaries, rents, taxes, interest, advertising and miscellaneous, are supported by summaries of ledger entries which were stipulated into evidence herein and which, in these respects, were not impeached by any evidence offered by respondent. We therefore find that these summary balances adequately substantiate these claimed deductions. See Gordon v. Commissioner,268 F.2d 105, 108-109↩ (3d Cir. 1959), revg. and remanding a Memorandum Opinion of this Court.